**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**BROWN & ROOT, INC., et al.,
Respondents.**

No. 14680.

United States Court of Appeals
Eighth Circuit.

Jan. 4, 1963.

William A. Brown, Houston, Tex., for respondent; Ben H. Powell, Jr., Houston, Tex., on the brief.

William J. Avrutis, Atty., N.L.R.B., Washington, D. C., for petitioner; Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William J. Avrutis and Joseph C. Thackery, Attys., N.L.R.B., Washington, D. C., on the brief.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and HENLEY, District Judge.

HENLEY, District Judge.

This proceeding was brought by the National Labor Relations Board pursuant to section 10(e) of the National Labor Relations Act, as amended by the Labor Management Relations Act of 1947, 29 U.S.C.A. § 160(e), to secure enforcement of a back pay order entered by the Board on July 31, 1961. The order awarded back pay amounting to $54,979.00 to 54 former employees of respondents, which the Board had formerly found to have been discriminatorily refused reinstatement by respondents following a strike in 1948 and 1949. Respondents resist enforcement of the order.

In 1947 respondents, construction contractors, formed a joint venture known as Ozark Dam Constructors, hereinafter Ozark, the purpose of which was to build the Bull Shoals Dam across the White River in north Arkansas. Later in the same year respondents formed another joint venture known as Flippin Materials Co., hereinafter Flippin, the purpose of which was to supply crushed stone aggregate to be used by Ozark in the construction of the dam.

At an early stage in the construction of the dam Ozark became involved in a dispute with the labor union claiming to represent Ozark employees. In 1951 this Court held that the union was in fact entitled to recognition as the collective bargaining agent of the employees in question. National Labor Relations

Board v. Ozark Dam Constructors, 8 Cir., 190 F.2d 222.

In December 1948 while the recognition proceedings were pending before the Board a considerable number of Ozark employees went out on strike and were joined by some of the Flippin employees. In December 1949 the strike was settled and it was agreed that the strikers would be reinstated.

Attempted implementation of the reinstatement agreement resulted in further controversy between respondents and the union. This controversy arose in January 1950, and in March of that year the union filed charges against respondents alleging that the latter had discriminatorily refused to grant reinstatement to the employees whose names were included in a written demand for reinstatement made on respondents by the union on January 15, 1950. In 1952 the Board found in effect that the employees whose names were included in the January 15, 1950, list had been discriminatorily denied reinstatement, that the union had the right to represent said employees, and that the January 15, 1950, list constituted a valid request for reinstatement on behalf of the several employees whose names appeared on the list. The Board further found and ordered that the affected employees should be reinstated with back pay as authorized by section 10(c) of the Act, 29 U.S.C.A. § 160(c). However, the Board's findings and order were general. No effort was made at that time to make any dollars and cents award in favor of any particular individual, and in its decision the Board reserved "the right to modify the back pay and reinstatement findings herein if made necessary by a change in circumstances since the hearing or in the future or to make such supplements thereto as may hereafter become necessary in order to define or clarify their application to a specific set of circumstances not now apparent." The Board's

order was directed at both Ozark and Flippin.

Respondents refused to comply with the 1952 order of the Board, and the latter sought enforcement here. On March 24, 1953, this Court granted enforcement as to Ozark, but denied it as to Flippin.[1] National Labor Relations Board v. Brown & Root, 8 Cir., 203 F.2d 139, rehearing denied 206 F.2d 73.

Respondents and the Board were not able to agree following our 1953 decision as to which individuals were entitled to back pay or as to the amounts of back pay to be awarded to particular strikers. The controversy, already prolonged, remained in this posture until January 1957 when the Board's Regional Director, acting in accordance with section 102.52 of the Board's regulations, issued and served upon respondents a formal back pay specification awarding specific amounts of back pay to 75 former employees of respondents.[2]

Respondents answered the back pay specification, and hearings were held before a trial examiner of the Board between August 5, 1958, and December 3, 1958. In January 1960 the trial examiner filed a Supplemental Intermediate Report in which he recommended that back pay be awarded to 46 of the 75 strikers included in the back pay specification. The total amount of the examiner's recommended awards was $46,978.00.

Both sides excepted to the report of the examiner, and after consideration the Board on July 31, 1961, issued and served its Supplemental Decision and Order which is now sought to be enforced. In general, the Board adopted the findings and recommendations of the examiner but made certain modifications therein, some of which were favorable to the respondents and some of which were otherwise. The ultimate finding of the Board was that 54 former employees should receive back pay totaling $54,979.00.

1. Flippin is not involved in the particular phase of the controversy now before the Court.

2. By 1957 the dam had been completed and questions of reinstatement as such had become academic.

In resisting enforcement of the 1961 order respondents advance a number of contentions: (1) That the Board and the examiner erred in refusing to receive or consider evidence to the effect that some of the strikers included in the January 1950 list were not available for employment and for that reason were not entitled to back pay; (2) That the Board employed an improper and illegal formula in computing back pay; (3) That the Board erred with respect to the incidence of the burden of proof on certain issues; and (4) That some of the Board's findings are not supported by substantial evidence in the record.

■■■ We proceed to a discussion of these contentions bearing in mind that the scope of our review of an order of the Board is limited, although we do not sit merely to rubber stamp administrative action, nor are we in passing upon the Board's decision to abdicate our conventional judicial function. Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; National Labor Relations Board v. Brown & Root, Inc., supra. It is not the function of this Court to try the case de novo or to substitute its own appraisal of the evidence for that of the Board. If the Board has conceived the law correctly, if it has not acted arbitrarily or capriciously, and if its findings are supported by "substantial evidence on the record considered as a whole," they are conclusive and binding on this Court even though we might have made different findings upon an independent consideration of the same evidence. Labor Management Relations Act of 1947, § 10(e), 29 U.S.C.A., § 160 (e); Universal Camera Corporation v. National Labor Relations Board, supra; National Labor Relations Board v. Brown & Root, Inc., supra.

## 1.

It is argued by respondents that the list of strikers submitted by the union in January 1950 contained the names of 350 individuals; that many of those individuals were not in fact available for employment by respondents at that time; and that the hearing examiner and the Board erroneously refused to receive evidence of such alleged unavailability and based their refusal on the doctrine of *res judicata,* the agency taking the position that an inquiry as to availability for employment of particular strikers was foreclosed by our 1953 decision.

The short answer to this contention is that the examiner and the Board did not refuse to receive or consider evidence as to the availability or nonavailability of particular individuals. Indeed, a great deal of testimony was taken and considered on that question.

■ What the Board did refuse to receive was evidence offered for the purpose of proving that the January 1950 list was not a valid application for reinstatement filed on behalf of the listed employees. That question was decided specifically in our 1953 holding, and the Board was not required to consider it again. In this connection we said in our 1953 opinion (p. 147 of 203 F.2d):

"We think that the Board was justified in finding that on January 15, 1950, the Joint Council unequivocally demanded that Ozark reinstate strikers whom the Council represented and whose names were listed, and that thereafter they were not required to apply individually to Ozark in order to be entitled to reinstatement. See and compare, M. H. Ritzwoller Co. v. National Labor Relations Board, 7 Cir., 114 F.2d 432, 436–437; Eagle-Picher Mining & Smelting Co. v. National Labor Relations Board, 8 Cir., 119 F.2d 903, 914; Olin Industries, Inc. v. National Labor Relations Board, 5 Cir., 191 F.2d 613, 617–618. We can think of no valid reason why a labor union which is the collective bargaining agent for employees who have been out on strike cannot effectively represent them in applying for reinstatement, even though the employer insists that they apply personally for re-employment.

"If in its compliance investigation the Board shall discover that strikers who were named in the Joint Council's list attached to its demand of January 15, 1950, and who the Board has found were entitled to reinstatement and back pay, were not in fact available for positions or that positions were not available for them, we think the Board, under its reservation of jurisdiction, can conform its ultimate reinstatement and back pay order to meet that situation. See and compare, Wallace Corporation v. National Labor Relations Board, 4 Cir., 159. F.2d 952, 954; National Labor Relations Board v. Bird Machine Co., 1 Cir., 174 F.2d 404."

The fallacy of respondents' argument is that it confuses an "application for reinstatement" filed on behalf of an employee with the employee's "availability for employment." The two things are not the same. A man may apply for reinstatement to a position and not be available to fill it, or he may be available to fill his old position but fail to make application to be reinstated to it.

### 2.

Prefatory to a discussion of respondents' attack on the formula employed by the Board in calculating the amounts of the back pay awards, it is well to note that the purpose of a back pay award is to make whole the employee who has been discriminated against as the result of an unfair labor practice. The employee is entitled to receive what he would have earned normally during the period of the discrimination against him, less what he actually earned in other employment during that period. Of course, an employee must use reasonable diligence to find employment during the period of discrimination. He is not entitled to back pay for periods during which he voluntarily remained in idleness. National Labor Relations Board v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377; National Labor Relations Board v. Gul-

lett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337; Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271; National Labor Relations Board v. Harbison-Walker Refractories Co., 8 Cir., 137 F.2d 596; National Labor Relations Board v. Condenser Corporation of America, 3 Cir., 128 F.2d 67; National Labor Relations Board v. Brashear Freight Lines, 8 Cir., 127 F.2d 198.

In solving the problems which arise in back pay cases the Board is vested with a wide discretion in devising procedures and methods which will effectuate the purposes of the Act. Labor Management Relations Act of 1947, § 10(c), 29 U.S.C.A., § 160(c); National Labor Relations Board v. Seven-Up Bottling Co., supra; Phelps Dodge Corp. v. National Labor Relations Board, supra.

Obviously, in many cases it is difficult for the Board to determine precisely the amount of back pay which should be awarded to an employee. In such circumstances the Board may use as close approximations as possible, and may adopt formulas reasonably designed to produce such approximations. National Labor Relations Board v. East Texas Steel Castings Co., 5 Cir., 255 F.2d 284; National Labor Relations Board v. Kartarik, Inc., 8 Cir., 227 F.2d 190; Marlin-Rockwell Corporation v. National Labor Relations Board, 2 Cir., 133 F.2d 258. We have held that with respect to the formula for arriving at back pay rates or amounts which the Board may deem necessary to devise in a particular situation, "our inquiry may ordinarily go no further than to be satisfied that the method selected cannot be declared to be arbitrary or unreasonable in the circumstances involved." National Labor Relations Board v. Ozark Hardwood Co., 8 Cir., 282 F.2d 1, 7.

In the instant case the Board calculated its awards on the basis of calendar quarters during the periods of discrimination involving the respective employees. Such a basis has been sanction-

ed expressly by the Supreme Court in National Labor Relations Board v. Seven-Up Bottling Co., supra. The formula used in determining the gross back pay for the respective employees during the respective quarters of discrimination is described in the opinion of the Board as follows:

" * * * In essence, the General Counsel's formula computes the average hours of all employees working in each claimant's job classification, for each week of the period of discrimination found by the Board and the Eighth Circuit. * * * These average hours, which are taken to the closest approximation of the number of hours which would have been worked by such claimant absent the discrimination, are multiplied by the appropriate hourly wage rate to arrive at the proper amount of gross back pay due each claimant."

The Board stated further that the computations were made by the General Counsel for the Board with the assistance of a Board Senior Industrial Analyst. Certain adjustments were made in the formula to account for factors such as overtime and employees working in more than one job category.

The gross back pay of the respective employees having been determined by means of this formula, which the Board calls the adjusted average hours formula, appropriate deductions were made for the earnings of the respective employees during their periods of discrimination, and the Board awarded the respective employees the net amounts remaining. We are told that the Board has long used this formula in similar cases, including the Ozark Hardwood Co. case and the Kartarik case, both supra.

Respondents contend vigorously that the Board's formula is punitive and unrealistic and that it cannot be applied lawfully to the facts of this case, and respondents put forth here, as they did before the agency, an alternative formula of their own, which they refer to as the lump sum formula.

Stated briefly, the lump sum formula, as we understand it, involves a determination of all of the hours of work that would have been available during the period of discrimination to all of the discriminatees applying for replacement and for whom work was available. Those total hours are then converted to dollars and cents, and the lump sum thus obtained is to be prorated among *all* of the discriminatees and not simply the 75 mentioned in the back pay specification. However, respondents propose to make payments only with respect to the 54 claimants in whose favor the Board made back pay awards, and, further to charge those claimants with interim earnings received during the periods of discrimination.

Respondents' formula was considered and rejected by both the trial examiner and by the Board. The relative merits and demerits of both formulas have been discussed fully by both sides. We see no purpose in detailing those arguments here. After full consideration we have concluded that the Board was justified in rejecting respondents' formula, and that the Board's own formula as applied in this case is not arbitrary, capricious, or punitive. Hence, it will not be disturbed.

3.

In the course of the hearings before the examiner 40 of the 75 claimants appeared and testified, and 35 did not testify. The examiner made awards in favor of 20 of the claimants not testifying, and denied the claims advanced on behalf of eight of such claimants. It appears that the claims of the other seven were withdrawn by the General Counsel for the Board. On exceptions to the examiner's report the Board upheld the examiner as to the 20 nontestifying claimants in whose favor back pay awards had been recommended, but sustained the General Counsel's exceptions with respect to the eight nontestifying claimants to whom the examiner had made no awards, and made awards to them as well.

In their Statement of Points respondents assert that the Board erred in plac-

ing on respondents the burden of proof as to availability, interim earnings, and diligent search for employment, and in awarding back pay to parties who did not testify.

It is the position of respondents that the burden was on the General Counsel to establish as part of his case that a given individual was available for employment, and that he had used reasonable diligence to find employment. Respondents contend also that the General Counsel was required to establish as part of his case the amount or absence of interim earnings. It is argued that the General Counsel did not establish these things, and that he therefore failed to make a case as far as the nontestifying claimants are concerned.

The Board contends, on the other hand, that discrimination and applications for reinstatement having been shown, the General Counsel had made out a prima facie case, and that the burden was upon respondents to come forward and show that they were not liable to particular nontestifying claimants or that their liability should be mitigated on account of interim earnings, willful refusal to work, or for some other reason.

■ Unquestionably, in an unfair labor practice proceeding before the Board the burden is upon the General Counsel to show by a preponderance of the evidence that the respondent has been guilty of an unfair labor practice and that there should be an award of back pay. And, it may be conceded that in a back pay proceeding the burden is upon the General Counsel to show the gross amounts of back pay due. When that has been done, however, the burden is upon the employer to establish facts which would negative the existence of liability to a given employee or which would mitigate that liability. See in this connection, Phelps Dodge Corp. v. National Labor Relations Board, supra, 313 U.S. at 198–200, 61 S.Ct. at 854–855; National Labor Relations Board v. Cambria Clay Products Co., 6 Cir., 215 F.2d 48, 56; National Labor Relations Board

v. J. G. Boswell Co., 9 Cir., 136 F.2d 585, 597.

■ In reaching our conclusion that the Board did not err in considering that the burden was on respondents to show facts which would eliminate or mitigate liability to the nontestifying employees we do not overlook the fact that section 102.53 of the Board's regulations provides that a back pay specification "shall specifically and in detail show, for each employee, the back-pay periods broken down by calendar quarters, the specific figures and basis of computation as to gross back pay and interim earnings, the expense for each quarter, the net back pay due, and any other pertinent information." We do not think that this provision of the regulation serves to place on the Board at a back pay hearing the burden of proof on such issues as an employee's availability for employment, or of the availability of employment for the employee, or the amount of interim earnings, or that the employee could not have obtained interim employment by the exercise of reasonable diligence.

■ In our estimation the purpose and effect of the regulation was merely to require the Board to make known to the employer in the back pay specification the amounts of gross back pay which were contended to be due to the respective employees and the credits which the Board was prepared to concede.. Obviously, such a requirement serves the dual purpose of limiting the Board's original demands and of obviating the necessity of the employer proving interim earnings and similar items which the Board is prepared to concede in a given case. It does not follow, however, that because the Board requires back pay specifications to give full information to employers the Board assumes the burden of establishing the truth of all of the information supplied or of negativing matters of defense or mitigation.

■ With further regard to the nontestifying employees respondents argue that the Board's attorney in the course

of the hearings before the examiner promised to produce all of the claimants, that respondents relied on the alleged promise, that the promise was not fulfilled, and that in the circumstances the awards in favor of the nontestifying employees should not be sustained.

There is no merit in this contention. Assuming, without deciding, that a "promise" made by the Board's attorney to produce individual claimants would or could have the effect of shifting to the Board the burden of proving the matters now under discussion, we are convinced that the statements of the Board's attorney did not amount to any promise upon which respondents had a right to rely. Moreover, any prejudice that might have resulted was largely mitigated by the Board's action in giving respondents a post decisional opportunity to examine the 28 nontestifying claimants. After making its determination that 28 nontestifying claimants should receive back pay, the Board went on to say:

"Particularly in the circumstances of this case, we believe that the award of back pay, in the above amounts, to 28 claimants who did not testify is legally proper and binding upon Respondents. The present case has been in litigation for an inordinate length of time; it must finally be brought to a close. In this context, we nevertheless desire to afford Respondents some reasonable opportunity to examine these claimants before the awarded back pay is turned over to them. Accordingly, the Regional Director is instructed to hold in escrow the amounts of back pay awarded the claimants who did not testify, and to make suitable arrangements to accord Respondents, together with the General Counsel's representative, an opportunity to examine them as to their interim earnings and activities. The Regional Director shall make a final determination whether any interim earnings or other amounts, in excess of those shown herein, are revealed which are properly deductible from a claimant's back pay award under existing Board precedent. Where so determined, the Regional Director shall make such deductions and return the amounts deducted to Respondents. The Regional Director is further instructed to report to the Board when these matters have been finally resolved, and in any event no later than one year from the date of this Supplemental Decision, the status of these cases at such time."

 While respondents argue that the Board improperly required a deposit in escrow as a condition precedent to a full hearing, it is seen that this argument is not impressive. The full hearing already had been held. The Board simply gave respondents another opportunity to examine such nontestifying claimants as might be located within a twelve months' period from the date of rendition of the decision for the purpose of determining whether respondents were in fact entitled to larger credits than had been disclosed by the Board's own investigations. The Board was not required to adopt such a procedure with respect to the nontestifying claimants, and the Board's action was beneficial rather than prejudicial to respondents.

### 4.

Finally, it is argued that the Board's findings of average earnings of all employees are not supported by substantial evidence, and that there is no substantial evidence to support the Board's findings as to interim earnings and entitlement to back pay in numerous individual cases.

The Board's findings as to average earnings were based upon the testimony of and computations made by a Board analyst who testified in the course of the hearings before the examiner. The analyst made his computations from the payroll records of respondents which are extremely voluminous. The records themselves were not introduced in evidence at

the hearing, but microfilms of them had been prepared, and the microfilms, the accuracy of which is not questioned, were introduced. It appears that microfilms were introduced in boxes with each box covering 2,000 separate documents. Thirteen boxes in all were introduced.

Although, as has been discussed, respondents challenge the correctness of the formula used by the Board in computing gross back pay, respondents have not attempted to show substantial error in the mathematical computations made by the Board's analyst in applying that formula. In their brief respondents simply set up the average hours found to have been worked by a number of carpenters in work weeks during a period from December 25, 1949, through November 12, 1950, and then challenge the Board to demonstrate that its findings are correct.

We do not think that the Board is required to meet this challenge. Rather, the burden is upon respondents to demonstrate that those findings and other relevant findings as to average hours worked are not supported by substantial evidence, and this the respondents have failed to do.

In their brief respondents have attacked the awards made to 22 specific individuals on the ground that the awards lack substantial evidentiary support. In connection with those particular awards respondents in large measure undertake to relitigate matters foreclosed by our 1953 decision. Further, in instances the attacks on the awards are based upon the premise that the burden of proof with respect to interim earnings and similar matters was upon the Board, which premise we have heretofore rejected. When contentions which are not open for consideration here are ignored, and when it is kept in mind that the burden with respect to matters of avoidance and mitigation is upon the respondents rather than upon the Board, we are persuaded that the 22 individual awards in question have adequate evidentiary support.

Enforcement of the Board's order will be granted subject to the following qualification:

The escrow provisions of the Board's order relating to the 28 claimants who did not testify will be continued in force for a period of one year after this decision becomes final. As indicated, the Board has made an award to each of these 28 non-testifying claimants, and the provisions made by the Board for the further handling of the claims of those individuals have heretofore been set out in this opinion. No award made to any of the non-testifying claimants is to be disbursed unless application for such disbursement is made by or on behalf of such claimant, except that if a claimant is deceased or incompetent the application may be made by or on behalf of a guardian, administrator, executor, or other proper legal representative of the claimant or his estate. Upon such application being made, the Board shall promptly take steps to activate the provisions of its order for making such claimant available for questioning as contemplated by that portion of the Board's order heretofore quoted, and if the individual claimant is unable to testify by reason of death or disability resort may be had, under appropriate supervision of the Board, to other evidence of interim earnings and activities of the claimant. The Board shall promptly make its final determination as to how much, if any, of its award is to be paid. If the award is mitigated, the amount of the mitigation shall be refunded immediately to respondents, and, of course, if the award is set aside, the entire amount of the award shall be refunded. If there is no application for disbursement of an award within one year after this decision becomes final, the award shall be considered to have lapsed, and at the end of the one year period the amounts of lapsed awards, if any, shall be refunded to respondents.