NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNITED CONTRACTORS INCORPO-
RATED and JMCO Trucking, Incorpo-
rated, joint employers, Respondents.

No. 78–2609.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 28, 1979.

Decided Feb. 1, 1980.

Charles P. Donnelly, N.L.R.B., Wash-
ington, D. C., for petitioner.

Joseph W. Weigel, Milwaukee, Wis., for
respondents.

Before CUMMINGS, Circuit Judge, WIS-
DOM, Senior Circuit Judge,* and CUD-
AHY, Circuit Judge.

WISDOM, Senior Circuit Judge.

This case is before the Court on the appli-
cation of the National Labor Relations
Board for enforcement of its Supplemental
Decision and Order regarding the amount
of back pay to be awarded to three employ-
ees of the respondent. In an earlier pro-
ceeding the National Labor Relations Board
determined that United Contractors and
JMCO Trucking (JMCO) constituted a sin-
gle employer/respondent within the mean-
ing of the Act. The Board held that JMCO
had committed unfair labor practices by
discharging three employees and by bypass-
ing the employees' union to deal directly
with the workers. *United Contractors, Inc.,*
220 N.L.R.B. 463 (1975). This Court af-
firmed the Board's order. *United Contrac-
tors, Inc. v. NLRB,* 7 Cir. 1976, 539 F.2d 713,
*cert. denied,* 1977, 429 U.S. 1061, 97 S.Ct.
785, 50 L.Ed.2d 777. An administrative law
judge subsequently accepted the General
Counsel's back pay formula and award.
The Board adopted as its order the supple-
mental order of the administrative law

---

* The Honorable John Minor Wisdom, Senior Cir-
cuit Judge of the United States Court of Ap-
peals for the Fifth Circuit, is sitting by designa-
tion.

judge. *United Contractors, Inc.*, 238 N.L. R.B. No. 123 (1978). We decline to enforce the Board's order and remand the case for another hearing because the administrative law judge and the Board ignored uncontradicted evidence that the Board's back pay formula was inapplicable in this case.

## I

In September 1974 Milan Mix, Guy Bourdo, and Percy Williams were all truck-driver employees of JMCO and members of Local No. 200 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. In June and September 1974 Mix and Bourdo filed grievances with the union because they were dissatisfied with their employer's new compensation plan that paid drivers a percentage of the amount JMCO charged users of its truck services. The employees made their own contributions to the Teamsters' welfare and pension funds. After the union pressed Jim Mews (president of both JMCO and United Contractors) about the grievance, he discharged all three employees, stating that he had no use for their services until the "union problems" were straightened out.

The union filed an unfair labor practice charge with the Board on October 11. The Board issued a complaint on December 30, charging that the company had engaged in discriminatory layoffs against union employees and had refused to bargain with the union. On January 24, 1975, JMCO offered reemployment to Bourdo and Mix. They agreed to return on February 4. Williams was reinstated about July 25.

After this Court enforced the Board's original order, the Regional Director issued a Back Pay Specification and Notice of Hearing stating that its back pay estimates were based on the "average weekly wage" of the discharged employees. " 'Average weekly wage' was determined by multiplication of the contractual hourly wage rate and the average number of hours which would have been worked by the discriminatee, per week, absent the discriminatory conduct. For the layoff period, the average number of weekly work hours was projected from the hours actually worked by each discriminatee in the months preceding and following the layoffs."[1] Under this formula the company owed $14,643.89.[2] The Notice stated that an answer was required within 15 days.

The company's answer denied all of the Board's allegations but was little more than a general denial. The company raised two affirmative defenses: Insufficient work existed to employ Williams, and all three discharged employees had received interim earnings that should decrease their awards.

The Board then amended its Back Pay Specification, adding $1,895.85 in contributions due to the Milwaukee Area Truck Drivers Health and Welfare Fund.[3] The company filed a supplemental answer stating specifically the basis for its position. More particularly, the company asserted that "seasonal" variations in JMCO's business rendered the Board's average weekly hours figure inappropriate. Instead, "the appropriate measure would be based upon the availability of work, if any, for the periods in question and . . . the proper computation would be the hourly rate of the parties involved times the number of hours of available work for those parties during the periods in question." Under this standard, $1,200 in back pay should be awarded because that amount was earned by individuals hired to replace the discharged employees. The answer repeated the affirmative defenses.

---

1. Findings and Conclusions of the administrative law judge.

2. The General Counsel awarded Mix $4,229.82, Bourdo $3,245.37, and Williams $7,168.70, plus interest accrued to the date of payment and minus the tax withholding required by federal and state laws.

3. The General Counsel stated that $636 was owed for Mix, $636 for Bourdo, and $953.55 for Williams, plus interest accrued to the date of payment.

The administrative law judge conducted a hearing on September 12, 1977. He found that the company had failed "to set forth in its answer the basis of its disagreement with the figures themselves" and that this failure "operates as an admission that the figures are accurate". The applicable Board rule is set forth in the margin of this opinion.[4]

The company contends that it did not admit the accuracy of the Board's figures and that it set forth reasons why they were inappropriate. But none of its arguments demonstrated that the Board's figures, all of which were derived from company records, were inaccurate. The heart of the company's contentions is that the Board's formula should not be applied in this case—where the work is irregular.

■ There is no doubt that the Board has a broad discretionary power to determine back pay. *NLRB v. Seven-Up Bottling Co.,* 1953, 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377. "[I]n many cases it is difficult for the Board to determine precisely the amount of back pay which should be awarded to an employee. In such circumstances the Board may use as close approximations as possible, and may adopt formulas reasonably designed to produce such approxima-

tions." *NLRB v. Brown & Root, Inc.,* 8 Cir. 1963, 311 F.2d 447, 452. "If the Board was not arbitrary in the selection of a formula, its choice may not be rejected." *NLRB v. Charley Toppino & Sons, Inc.,* 5 Cir. 1966, 358 F.2d 94, 97. "[T]he burden is upon the employer to establish facts which would negative the existence of liability to a given employee or which would mitigate that liability." *NLRB v. Brown & Root, Inc.,* 8 Cir. 1963, 311 F.2d 447, 454; *accord, NLRB v. Mastro Plastics Corp.,* 2 Cir. 1965, 354 F.2d 170, 178, *cert. denied,* 1966, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682.

The Board found that JMCO engaged primarily in road construction in Wisconsin. 220 N.L.R.B. at 463. During the winter months when road construction was infeasible or impossible, it undertook demolition work. The company contended that it employed fewer full-time workers during this season, and that trucks were often idle.

The administrative law judge disagreed that the company was a seasonal employer. He cited testimony by Mix that (1) seasonable layoffs in the past had lasted for one or two weeks and had been given for deer hunting, and (2) Mix performed other work, primarily truck repair, on occasion during prior winter slack periods. He also cited

4.   *   *   *

(b) *Contents of the answer to specification.* —The answer to the specification shall be in writing, the original being signed and sworn to by the respondent or by a duly authorized agent with appropriate power of attorney affixed, and shall contain the post office address of the respondent. The respondent shall specifically admit, deny, or explain each and every allegation of the specification, unless the respondent is without knowledge, in which case the respondent shall so state, such statement operating as a denial. Denials shall fairly meet the substance of the allegations of the specifications denied. When a respondent intends to deny only a part of an allegation, the respondent shall specify so much of it as is true and shall deny only the remainder. As to all matters within the knowledge of the respondent, including but not limited to the various factors entering into the computation of gross back pay, a general denial shall not suffice. As to such matters, if the respondent disputes either the accuracy of the figures in the specification or the premises on which they are based, he shall specifically state the basis for his disagreement, setting forth in detail his position as to the applicable premises and furnishing the appropriate supporting figures.

(c) *Effect of failure to answer or to plead specifically and in detail to the specification.* —If the respondent fails to file any answer to the specification within the time prescribed by this section, the Board may, either with or without taking evidence in support of the allegations of the specification and without notice to the respondent, find the specification to be true and enter such order as may be appropriate. If the respondent files an answer to the specification but fails to deny any allegation of the specification in the manner required by paragraph (b) of this section, and the failure so to deny is not adequately explained, such allegation shall be deemed to be admitted to be true, and may be so found by the Board without the taking of evidence supporting such allegation, and the respondent shall be precluded from introducing any evidence controverting said allegation. Board's Rules & Regulations §§ 102.54(b) & (c).

testimony by the discharged employees that they noticed trucks operating during the layoff period.

We cannot say that the Board's determination that the company was not a seasonal employer is clearly erroneous. The evidence did indicate that some demolition was performed during the winter months. We do find, however, that it ignored evidence demonstrating that employment was irregular and that economic factors may have prevented the discharged employees from working at JMCO during part of the layoff period.

The discharged employees themselves gave evidence that work was not steady at JMCO:

MIX:

Q (By Mr. Weigel) And would the length of the lay off also depend upon whether or not work was available?

A Yes.

Q Now, would the, say during the years 1973, '75, '75, would you work the exact number of hours every week when you were working?

A No.

Q Would the amount of time that you worked during any given week or month depend upon the amount of work that was available?

A Would you repeat that, please?

Q Would the number of hours that you would work during any month depend upon the amount of work that was available?

A Well, sort of, yes.

Q Would depend upon what, if any, jobs the company had as far as demolition or grading or paving for example?

A I suppose, yes.

Q And has that been the usual thing pretty much through the or during the years '73, '74, and '75?

A I would say so, yes.

Q So, would I be correct in stating when there is work sometimes you work overtime and when there is no work you might not work at all?

A Right.

BOURDO:

Q Would I be correct in stating that your work during the years you've been there since '70 or '71, whenever, your work varies with the amount of work that's available?

A Yes.

Q In other words, when there is a lot of jobs you might work overtime. When there is no jobs you might not work at all; is that correct?

A Right.

WILLIAMS:

Q Okay. Does the amount of work you get depend to a great extent upon how much work they got for you?

A I would say, yes. Yeah.

Q In other words, there—sometimes when you work overtime and work a lot when there is a job to be done?

A Sure I do.

Q And sometimes you might not work at all when there is no job?

A There is nothing to do.

Q Was there a period of time earlier this summer when there was just no work?

A Right.

Q The guys were not working; is that correct?

A Right.

The Board ignored the company's evidence that during slack periods driving was assigned to available employees according to seniority, regardless of whether the worker usually drove a truck. The company admitted that it hired replacement drivers for two of the discharged employees and that these replacements worked during October. It contended, however, that senior employees drove trucks during November, December, and January. Bourdo and Mix came back to work on February 4. Bourdo and Williams testified that all of the drivers they observed working during November and December were senior to Mix. The Board disregarded all of this evidence and awarded wages for all of the time missed by the employees; indeed, it gave them overtime pay based on the average overtime earned throughout the year.

The Board also erred by ignoring uncontradicted testimony about the amount of back pay due Williams. Williams was hired in July or August 1974. An extra truck was purchased at approximately the same time. The company contended that there was no work for Williams during the layoff period; no replacement for him was hired. Two of the discharged employees testified that only two trucks were used during October. Apparently, three trucks operated in November and December, but these were driven by employees senior to Williams. Bourdo testified that, "as far as [he] could remember", two trucks were used from January to July 1975. Williams was reemployed about July 25.

This uncontradicted evidence supports the company's position that there was no work for Williams during the period he was discharged. Despite this evidence, he was awarded $7,168.70, a large part from overtime he would earn, theoretically, throughout the year. This finding constitutes error. To rebut the company's evidence, the General Counsel will have to adduce testimony that Williams would have been employed during the layoff period but for the unlawful discharge.

The Board may have given Bourdo back pay while he was ill. Testimony indicated that he began work a week or two after reinstatement because of illness. In oral argument the Board's counsel admitted that back pay may have been awarded for this period, and that any such award would be improper. Although the record is unclear, figures in the General Counsel's complaint show that overpayment may have occurred. The complaint states that Mix and Bourdo were both owed four weeks of pay for the first part of 1975, although Bourdo's testimony suggests that he came back to work after Mix.

## II

"[A]n employer may, without incurring back-pay liability, refrain from reinstating a discriminatorily discharged employee during a period when employment would not have been available for him even absent the discrimination." *NLRB v. Sterling Furniture Co.,* 9 Cir. 1955, 227 F.2d 521, 522. The extent to which work at JMCO was seasonal is unclear. There is no doubt, however, that the work was irregular and that during slack periods newer employees were laid off. We remand this case to the Board for a new hearing on the company's contention that these factors justify a reduction of the back pay award.