NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNITED CONTRACTORS INCORPORATED and JMCO Trucking Incorporated, Joint Employers, Respondents.

Nos. 82–1556, 82–1563.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1982.

Decided Aug. 3, 1983.

---

Federick Havard, Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

Joseph W. Weigel, Milwaukee, Wis., for respondents.

Before BAUER and COFFEY, Circuit Judges, and HOFFMAN, Senior District Judge.*

COFFEY, Circuit Judge.

This case is before the court on the application of the National Labor Relations Board ("NLRB" or "the Board") for enforcement of two decisions of the Board directing the joint employer respondents, JMCO Trucking Inc. and United Contractors Inc., to make back pay and fringe benefit payments to three employees who the Board and this Court found were unlawfully laid off and discharged. The respondents challenge the formulas used by the Board to compute the monies due the employees. As the NLRB properly calculated the amounts due the employees after thoroughly considering the evidence before it, we grant enforcement of the Board's orders.

## I.

The two orders herein concern two separate and distinct periods of discriminatory layoffs and discharges. The factual and procedural background of each of the orders will be treated separately.

### A. "United I"

In September of 1974, Milan Mix, Guy Bourdo, and Percy Williams were truckdriver employees of JMCO and members of Local No. 200 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("the union").

In June and September of 1974 Mix and Bourdo filed grievances with the union challenging a new compensation plan unilaterally instituted by their employer. After the union questioned the president of both JMCO and United Contractors, James Mews, about the grievances, Mews discharged the three employees, stating that he had no use for their services until the "union problems" were straightened out.

The union filed an unfair labor practice charge with the NLRB on October 11, 1974 and two and one-half months later the Board issued a complaint charging the company with discriminatorily discharging the three union employees and refusing to bargain with the union. JMCO reinstated Bourdo and Mix in late January of 1975 and Williams was reinstated in late July of the same year.

The Board ruled on the complaint in *United Contractors, Inc.,* 220 N.L.R.B. 463 (1975), holding that: (1) The truckdrivers employed by United Contractors and JMCO Trucking Inc. (collectively "the Company") were an appropriate unit for collective bargaining within the meaning of Section 9(b) of the National Labor Relations Act ("the Act"); (2) United and JMCO are to be considered a single employer within the meaning of the Act; (3) The Company discriminatorily discharged drivers Mix, Bourdo and Williams on September 30 and October 4, 1974 in violation of Sections 8(a)(1) and (3) of the Act; (4) The Company violated Section 8(a)(5) of the Act by ceasing to make contributions to established employee benefit funds as required under the collective bargaining agreement; and (5) The Company was required to offer reinstatement to the truckdrivers and to make each of them "whole for any loss of earnings [they] may have suffered by reason of the discrimination against [them]." *United Contractors, Inc.,* 220 N.L.R.B. at 471.

Subsequently the Company petitioned this court to review the Board's decision

---

* The Honorable Walter E. Hoffman, Senior District Judge of the United States District Court for the Eastern District of Virginia, is sitting by designation.

and the NLRB cross-petitioned for enforcement of its order. This court enforced the NLRB's order in *United Contractors, Inc. v. NLRB,* 539 F.2d 713 (7th Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). In attempting to comply with this court's decision, the Board's Regional Director issued a back pay specification calculating the award on the basis of a formula incorporating the "average weekly wages" of Mix, Bourdo and Williams.[1] In a supplemental decision the Board affirmed the administrative law judge's decision, accepting the Regional Director's back pay formula and award. *United Contractors, Inc.,* 238 N.L.R.B. 893 (1978).

This court subsequently refused to enforce the Board's supplemental backpay decision and remanded the proceeding to the NLRB for a new hearing holding that "the administrative law judge and the Board ignored uncontradicted evidence that the Board's back pay formula was inapplicable in this case." *NLRB v. United Contractors, Inc.,* 614 F.2d 134, 135 (7th Cir.1980). The Board was directed to consider the following factors: (1) "that employment was irregular and that economic factors may have prevented the discharged employees from working at JMCO during part of the layoff period"; (2) "that during slack periods driving [duties were] assigned to available employees according to seniority, regardless of whether the worker usually drove a truck"; (3) "that there was no work for Williams during the layoff period [and] no replacement for him was hired"; and (4) that Bourdo's backpay award was excessive in that he was unavailable for work due to illness. *United Contractors, Inc.,* 614 F.2d at 137–38.

On April 15, 1980, this court denied an NLRB petition for modification of our decision directing a remand. After holding a hearing to consider additional evidence on the issues noted in this court's decision, the administrative law judge ("ALJ") issued a second supplemental decision and back pay order which was later affirmed by the Board. *United Contractors, Inc.,* 259 N.L.R.B. 1069 (1982).

The Board's amended computation of the backpay due Mix, Bourdo and Williams is based on the hours actually worked by the non-unit and replacement drivers during the 1974–75 layoff period as reflected in the JMCO payroll records. The amended computation assigned to the discriminatees, on the basis of their (Bourdo, Mix and Williams) unit seniority, the earnings of the replacement drivers and non-unit employees who periodically drove a truck. To arrive at the gross backpay owed to Mix and Bourdo the replacements' hours were multiplied by the applicable wage rate for the time period in question pursuant to the collective bargaining agreement. Under this method of computation, the Board determined that work would not have been available for Williams even had he not been discriminatorily discharged and, accordingly, it refused to award him backpay for that period.

At the hearing before the administrative law judge, the Company contended that the hours worked by the non-unit employees should not be assigned to the discriminatees as each of them had more company-wide seniority than either Mix or Bourdo. The Company's argument was premised upon its claim that a company-wide seniority plan was in operation at the time of the layoffs that allowed the transfer of truck-driving assignments to senior non-unit employees.[2]

After hearing the testimony, the administrative law judge held, and the Board

---

1. The "average weekly wage" was determined by multiplication of the contractual hourly wage rates and the average number of hours which would have been worked by the discriminatees per week during the "discharge" periods, absent the discriminatory conduct. The average number of weekly work hours, for the layoff period, was projected from the hours actually worked by each discriminatee in the

months immediately preceding and following the layoffs.

2. James Mews, president of JMCO and United, testified that his interpretation of the seniority plan was that:

"A man with one skill can have less seniority than someone else with less time on the job,

agreed, that the Company failed to demonstrate that a company-wide seniority plan existed during the 1974–75 layoff period. The ALJ noted prior instances wherein the Company selectively laid off some of its most senior employees during slack periods while, at the same time, it retained the services of unit employees (truckdrivers) with less company-wide seniority. Thus, the Company's alleged policy of company-wide seniority was not substantiated in the record. In his findings, the administrative law judge found that the testimony of the Company's president, James Mews, concerning the seniority plan was incredible and, further, found that the testimony of Frank Watson, the Company's most senior employee was accorded little or no weight as it was vague, hostile and evasive. The administrative law judge also cited this court's earlier order in *NLRB v. United Contractors, Inc.,* 631 F.2d 735 (7th Cir.1980) in his decision. In determining the amended backpay award, the ALJ assigned the hours worked by all the replacement drivers between October 11, 1974 and February 4, 1975 to Mix and Bourdo respectively. The Board's January 15, 1982 second supplemental decision that affirmed the administrative law judge's determinations ordered the Company to reimburse Mix $2,169.15 and Bourdo $1,678.42 plus six percent interest, less the federal and state withholding taxes.[3]

The Board's second supplemental decision further directed the Company to make payments to two employee benefit funds in accordance with the terms of the collective bargaining agreement. Fund contributions

were declared due for weeks during the period of time that Mix, Bourdo and Williams did not work and for a period that the Company had earlier refused to make contributions although the drivers were working. The Company asserted that it tendered contributions to the respective funds, but the fund trustees refused to accept the monies. The administrative law judge after reviewing the record determined that the payments had never in fact been tendered. The Board's second supplemental decision ordered the Company to comply with the terms of the contract and to forthwith make the contributions to the benefit funds. Even though Williams was not awarded backpay, the Company nevertheless was ordered to make benefit fund contributions to the fund on his behalf for that period the Company had failed to make contributions. The Board directed the Company to contribute $964.50, $892.50 and $219.60 to the pension, and health and welfare funds on behalf of Mix, Bourdo and Williams, respectively.[4]

### B. *"United II"*

The second Board order under scrutiny involves the same parties as those involved in the earlier *United I* dispute. On May 17 and May 27, 1977, Guy Bourdo (Company truckdriver), filed grievances with the union alleging that the Company had failed to consider his seniority in his work assignments and also that he was not being paid in accordance with the collective bargaining agreement then in effect. A month after the grievances were filed, on June 26, 1977, the Company laid off Guy Bourdo and Per-

---

if the person with less time on the job has a higher level of skill."
The Company contended that the company-wide seniority plan had been in existence and observed since 1956.

**3.**

| Employee | Number of Hours | Wage Rate | Gross Backpay Per ALJ |
|---|---|---|---|
| Milan Mix | 314.50 | $6.90 | $2,169.15 |
| Guy Bourdo | 243.25 | 6.90 | 1,678.42 |

Backpay for Bourdo for the period of time from the date of his reinstatement until that

of his actual return was omitted from the amended specification because the Board determined that his actual return to work was delayed by illness.

**4.** The Board calculated the benefit payments as follows:

| | Health and Welfare | Pension |
|---|---|---|
| Mix | $445.50 | $519.00 |
| Bourdo | 412.50 | 480.00 |
| Williams | 100.65 | 118.95 |

cy Williams and later recalled them on July 29.

During the July 1977 layoffs of Bourdo and Williams, the Company's trucks were driven by Milan Mix, the only remaining working member of the union (Teamsters), and by two non-unit employees.

Thereafter, during October and November of 1977, Guy Bourdo and the two other truckdrivers, Percy Williams and Milan Mix, filed complaints with the State of Wisconsin and the City of Milwaukee alleging that the Company had paid them a hourly rate lower than that provided for in the approved state and local wage schedules. On November 11, 1977, the Company reduced the hourly wages of the aforementioned truckdrivers from $7.80 an hour to $7.49 retroactive to August 1, 1977, and laid them off. These drivers subsequently filed an unfair labor practice complaint with the Board.

After November 11, 1977 and through December of that year, the JMCO trucks were driven by three non-unit employees, a mechanic, Gordon Duquaine, a grading foreman, LaVerne Schlei, and a foreman, Frank Watson. On January 14, April 15 and April 8, 1978, Mix, Bourdo and Williams were called back to work and the non-unit employees returned to their regular tasks.

An administrative law judge conducted a hearing concerning the layoffs in response to the union's complaint and issued a decision finding that the three drivers had been unlawfully laid off as a result of their concerted activity. Five months later, on August 9, 1979, the Board adopted the conclusions of the administrative law judge finding that the Company had committed an unfair labor practice in laying off drivers Bourdo and Williams from June 26, 1977 to July 29, 1977 and again when they laid off all three drivers on November 11, 1977 for engaging in protected activities (filing grievances with the union and complaints with the State of Wisconsin). *United Contractors, Inc.,* 244 N.L.R.B. 72, 73 (1979). The Board affirmed the administrative law judge's decision that refused to accept the Company's excuse that the layoffs were caused by the occurrence of slack periods or the Company's backup excuse that they were in accordance with a seniority plan operating in contravention of the collective bargaining agreement.[5] The Board's order directed the Company to reinstate Mix, Bourdo and Williams and "make them whole for any loss of earnings they may have suffered," during each of the layoff periods. *Id.* at 74.

The NLRB order was enforced by this Court in *United Contractors v. NLRB,* 631 F.2d 735 (7th Cir.1980). Thereafter, the Board's Regional Director issued a backpay specification calculating the wages and benefit payments due the discriminatees and the Company filed an answer contesting the wage and benefit calculations. After a hearing, an administrative law judge adopted the backpay computation of the Regional Director. The NLRB then adopted the administrative law judge's supplemental backpay decision and order as its decision in *United Contractors, Inc.,* 260 N.L.R.B. 225 (1982).

The backpay specification for *United II* includes wages and the fringe benefit contributions due Bourdo and Williams for the improper layoffs from June 27, 1977 to July 26, 1977 and wages and contributions for Mix, Bourdo and Williams covering the layoff period from November 11, 1977 until their dates of reinstatement (January 14, 1978, April 15, 1978 and April 8, 1978, respectively).

During the initial layoff period (June 27 —July 26, 1977), the Company's trucks were

---

**5.** The collective bargaining agreement between the union and the Company provided, in pertinent part:

"The Employer ... shall not direct or require its employees or persons other than the employees in the bargaining units here involved to perform work which is recognized as the work of the employees in said units ...."

driven by non-unit Company employees who in this instance were not paid from the usual JMCO account but were paid from a United Contractors general account that did not specify the nature of the work for which the particular wages were paid. It was thus impossible to determine precisely the amount of truckdriving activity during the layoff period. Accordingly, the Board's backpay awards were based upon the average weekly earnings of Bourdo and Williams for the weeks immediately preceding the unlawful layoffs. The "average wage" method of computing backpay was approved by the administrative law judge based on the Board's earlier finding and this court's holding that the June-July layoffs were not caused by a slack period. In his decision, the ALJ also referred to an absence of credible evidence to support a determination that, in fact, the laid-off workers would have worked less hours than those which they were credited under the average wage method of computation.

The Board's method of computation for the second layoff period reflected the irregular and/or seasonal nature of the Company's business. The Board's supplemental decision calculates the backpay award based on the actual hours worked by the non-union replacement drivers as recorded in the payroll records of JMCO. The Company urged the administrative law judge rather to take into account the number of hours the replacement drivers actually spent driving a truck from a compilation of "dumpsite slips"[6] signed by the drivers. After hearing the testimony and reviewing the records, the administrative law judge determined that the dumpsite slips offered by the Company were not reliable indicators of the truckdriving work actually performed by the non-unit drivers as many of the slips were unsigned and unauthenticated and were therefore unreliable and that trips were made to dumps other than the one from which the Company offered "dumpsite

slips." Accordingly, the Board accepted the amounts calculated on the basis of the JMCO records and ordered the Company to pay Mix $2,295.15, Bourdo $6,839.09, and Williams $2,514.57, together with interest less amounts required to be withheld under federal and state laws.

## II.

ISSUES PRESENTED

I. Did the NLRB properly compute the wage and fringe benefit awards due the discriminatees for the periods of the unlawful layoffs and discharges in *United I?*

II. Did the NLRB properly compute the wage and fringe benefit awards due the discriminatees for the discriminatory layoffs involved in *United II?*

## III.

The scope of judicial review accorded an NLRB petition for enforcement is narrow. "[I]f the Board has conceived the law correctly, if it has not acted arbitrarily or capriciously, and if its findings are supported by 'substantial evidence on the record considered as a whole,' they are conclusive and binding on this court even though we might have made different findings upon an independent consideration of the same evidence." *NLRB v. Brown & Root, Inc.,* 311 F.2d 447, 451 (8th Cir.1963) (quoting Labor Management Relations Act of 1947, section 10(e), 29 U.S.C. section 160(e)). *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

As noted by the court in *NLRB v. Pilot Freight Carriers, Inc.,* 604 F.2d 375, 377 (5th Cir.1979):

"The Board enjoys broad, discretionary authority to formulate a remedy where an unfair labor practice has been committed. *N.L.R.B. v. J.H. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d

---

**6.** "Dumpsite slips" are forms signed by the truckdrivers when they haul loads of rubble to

be dumped at various landfill sites.

405 (1969). 'When the Board ... makes an order of restoration by way of backpay, the order "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." ' *N.L.R.B. v. Seven-Up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953)."

"Where backpay is in dispute, the sole burden on the Board is to show the gross backpay amount due the claimant." *Pilot Freight,* 604 F.2d at 377. "In many cases it is difficult for the Board to determine precisely the amount of backpay which should be awarded an employee. In such circumstances, the Board may use as close approximations as possible and may adopt formulas reasonably designed to produce such approximations." *NLRB v. United Contractors, Inc.,* 614 F.2d 134, 136 (7th Cir.1980) (*quoting Brown & Root,* 311 F.2d at 452). After the Board has thoroughly reviewed and evaluated the record and has arrived at an approximation, "the burden is upon the employer to establish facts which would negate the existence of liability to a given employee or which mitigate that liability." *Brown & Root,* 311 F.2d at 454. *See also NLRB v. NHE/Freeway, Inc.,* 545 F.2d 592, 593 (7th Cir.1976). "Our inquiry thus is limited to determining whether the record in its entirety provides a proper basis for the Board's decision" and whether the employer has provided evidence to negate the Board's decision. *NLRB v. Lyon & Ryan Ford, Inc.,* 647 F.2d 745, 750 (7th Cir.1981).

### A. *The NLRB's Second Supplemental Decision in "United I"*

In *NLRB v. United Contractors, Inc.,* 614 F.2d 134 (7th Cir.1980), we remanded *United I* to the NLRB with directions to consider the evidence presented by the Company that employment was irregular during the layoff period and that economic factors solely had prevented the truckdrivers from working when the Board calculated the backpay and fringe benefit specification. *NLRB v. United Contractors, Inc.,* 614 F.2d at 137–38. The Company challenges the amended *United I* backpay specification on the ground that the Board failed to consider all the evidence in accordance with this court's *United I* decision (614 F.2d 134). The Company contends that the Board merely modified the backpay specification based on the seasonal nature of the work, thereby ignoring evidence that showed: (1) that driving was assigned according to seniority; (2) that no one was hired to replace Williams; and (3) that Bourdo returned to work a couple of weeks after reinstatement due to illness. We do not agree with the Company as our review of the administrative law judge's decision reveals that full consideration was given to each and every one of the factors outlined by this court in *United I.*

▪ The record is clear that the administrative law judge properly considered the seasonal nature of the type of employment involved herein. Further, as to the alleged company-wide seniority system, the ALJ not only clearly reviewed the alleged system, but also made a factual determination that it did not exist. First, the ALJ took note of our decision in *United II* (631 F.2d at 735) affirming the Board's decision rejecting the Company's contention that the 1977 layoffs were made in accordance with a company-wide seniority plan. Although there was evidence presented that in the years preceding the unlawful layoff of 1974 truckdriving was on occasion performed by non-unit employees, the administrative law judge stated "there [was] a lack of evidence demonstrating that that occurred during periods when unit employees were on layoff status." Second, the administrative law judge considered and weighed the testimony of the Company's president, James Mews, that a company-wide seniority plan had been complied with historically, but found that the record did not support the Company's contention that such a plan ex-

isted during 1974.[7] Third, the administrative law judge considered the testimony of the most senior employee, Frank Watson, who testified that he did not work during periods that Mix and Bourdo continued to drive. According to Watson, he was not laid off but, rather, he requested the time off. The ALJ found Watson to be a vague, argumentative, hostile and evasive witness and thus accorded his testimony little weight. The ALJ based his decision that Watson had been laid off on the uncontradicted testimony of Bourdo who stated that on several occasions from 1970 through 1974 during periods of layoff Watson would visit job sites complaining about being laid off. In light of the totality of the evidence, the administrative law judge determined that the respondent failed to demonstrate that the truckdrivers were laid off pursuant to a company-wide seniority plan operating in contravention of the collective bargaining agreement.

"This court accords great weight to the credibility determinations of an administrative law judge, which are based on the first hand observations of a witness' demeanor." *NLRB v. Lyon & Ryan Ford, Inc.,* 647 F.2d 745, 753 (7th Cir.1981) (citing *NLRB v. Blue Hills Cemetery, Inc.,* 567 F.2d 529 (1st Cir. 1977)). "It is not this court's function to second guess the ALJ or retry the case on appeal when substantial evidence supports the administrative determination." *Lyon & Ryan Ford, Inc.,* 647 F.2d at 753. After reviewing the record, we conclude that the factors outlined by the administrative law judge satisfy the substantial evidence test and we accept the administrative law judge's finding that, in fact, a company-wide seniority system did not exist at JMCO and United Contractors during the layoff period from October 1974 to February 1975.

■ As to the remaining two factors which the company alleges were not addressed (Bourdo's illness and the unavailability of work for Williams), we also disagree. The administrative law judge determined that "there were no weeks during the backpay period in which work was available for Williams and consequently backpay is not [awarded] him" under the amended specification. The administrative law judge went on to state that "the revised specification takes into account that period in early January 1975 when Bourdo, due to illness, was unavailable to work." It is clear that the administrative law judge fully considered the evidence as directed by this court in the remand of *United I.*

■ The Board's Regional Counsel sustained his burden of ascertaining and showing a gross backpay amount due the discriminatees. The burden then shifted to the Company to establish facts which mitigated its liability. *NLRB v. NHE/Freeway, Inc.,* 545 F.2d at 593. We conclude that the company failed to sustain its burden to show mitigation of its backpay liability because, as previously delineated, we accept the finding of the ALJ that there did not exist a company-wide seniority plan in 1974. Hence, the amended backpay specification properly assigned the hours worked by the replacement drivers during the 1974–75 layoff period to Mix and Bourdo.

■ The next argument raised by the Company involves a question of fact; namely, whether the Company tendered

---

7. Respondent's president, James Mews, testified that, by its inaction, the Union had acquiesced in a practice, contrary to the above-cited contractual provision, of assigning driving work to non-unit employees. However, there is no evidence in the record showing that the Union was aware of this practice prior to the Board hearings in the instant matter which commenced early in 1975. On cross-examination, Mews conceded that, since that time, the Union has consistently protested the making of such assignments. At one point during his testimony, Mews appeared to deny the existence of a driver's unit, contending that "everybody in our company does everything, so everybody is in every unit." This answer was in conflict with Mews' response to a March 28, 1980 interrogatory, in which he stated that Mix, Bourdo and Williams were the only employees in the drivers unit.

monies to the pension, and health and welfare funds, which were allegedly refused by the fund trustees, and subsequently paid them directly to Bourdo, Mix and Williams.[8] It is the Company's position that it should be credited with the monies allegedly given to Bourdo, Mix and Williams because the employees were to contribute said monies to the pension, and health and welfare fund themselves. A review of the record before this court indicates that no evidence was presented to the ALJ or NLRB supporting the unusual allegation that Bourdo, Mix and Williams were paid monies which were, in fact, to be contributed to the funds by the employees. After a review of the record, we agree with the Administrative Law Judge that the Company failed to establish facts or present records which negate its liability as to the amount of fringe benefits owed.

Because we hold that the ALJ and the Board properly considered those issues we outlined in *NLRB v. United Contractors, Inc.*, 614 F.2d 134 (7th Cir.1980), we affirm the Board's second supplemental decision in *United I*.

### B. *The NLRB's Supplemental Decision in "United II"*

■ The Company also contends that the Board erred in adopting the administrative law judge's computation of the wages and fringe benefit payments due for the discriminatory layoff periods involved in *United II*. The Company's contention that the wages of replacement drivers were improperly credited to Mix and Bourdo for the post-November 11, 1977 discharge period due to a company-wide seniority system is rejected for the same reasons as discussed above (there was more than ample evidence before the ALJ to hold that, in fact, the Company did not have a company-wide seniority system). Further, the Company's contention that the Board improperly ordered fringe benefit payments is again rejected as the Company failed to present any evidence supporting the proposition that the

truckdrivers were paid monies which were, in turn, to be paid to the funds.

■ The administrative law judge's use of an average earnings formula for the determination of backpay due the discriminatees for the June-July 1977 layoff period is also challenged by the Company. The ALJ utilized the average earnings formula because it was uncontroverted that truckdriving was available and performed by others during the June-July 1977 period but no payroll records existed designating which specific non-unit employees did what amount of truckdriving.

Significantly, and contrary to the procedure followed during all the other time periods at issue herein, the truckdriving payroll was not recorded on the JMCO payroll ledger during the June-July 1977 layoff. The JMCO payroll was only utilized to compensate Company employees for truckdriving service and pay for truckdriving work was historically recorded on the JMCO ledger. With the exception of the June-July 1977 period, the United payroll account was used to pay the Company's employees for all non-truckdriving employment and the account did not specify which particular type of work (e.g., paving, demolition, etc.) was performed at a particular time. Faced with an utter lack of properly authenticated documentary evidence of which non-unit company employees performed truckdriving work during the summer layoff, or of how much work was performed, the Board concluded that a reasonable and accurate approximation of the wages that Bourdo and Williams would have received, but for their discrimination, could be extrapolated from the average weekly wages earned immediately prior to and after the one-month layoff period.

■ We hold that the ALJ and the Board properly adopted the average weekly earnings formula for calculation of the backpay owed to Bourdo and Williams for the summer layoff period. The approximation was

---

**8.** The amended specification does not seek fringe benefit contributions for Williams for the layoff period but only for the period prior to the layoffs when the company refused to make fringe benefit contributions.

based on: (1) the actual hours worked by the discriminatees during the summer of 1977 immediately before and after the lay-off; (2) the fact that truckdriving work was admittedly performed by others throughout the period in question; (3) the fact that traditionally the summer months were not a "slack period"; and (4) the fact that the employer failed to offer any evidence to substantiate the exact number of the hours spent truckdriving by non-unit employees. The Company's failure to document the hours worked by the replacement drivers distinguishes this period of discrimination from all the others involved herein where documentary evidence showed the amount of time spent by non-unit employees doing truckdriving tasks. The Company has hidden in the records of a secondary payroll account the wages earned by the replacement drivers. The Company argues that the Board's determination is wrong, but offers no evidence to refute the calculation. *See Brown & Root,* 311 F.2d at 456. The Company failed in its burden to demonstrate that the Board's reasonable approximation was improper in this case and we hold that the Board's finding on this issue supported by substantial evidence. As a practical matter, the Company had knowledge of the pertinent facts and complete and exclusive control of the payroll records and the burden of showing the error in the Board's calculation was appropriately upon it. *See NLRB v. Midwest Hanger Co.,* 550 F.2d 1101, 1105 (8th Cir.1977). *See also NLRB v. Mastro Plastics Corp.,* 354 F.2d 170, 176 (2d Cir.1965), *cert. denied,* 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966).

In this case it was impossible for the Board to determine precisely the amount of wages which were earned by the non-unit replacement drivers during June and July of 1977 as the Company had succeeded in secreting the appropriate figures in a secondary payroll account and refused to offer any specific evidence to refute the Board's approximation. The Company's payment of truckdriving wages from the United Contractors account was highly unusual and contrary to its customary practice. Under the circumstances herein, it was appropriate for the Board to adopt the average weekly wage formula for its approximation. *United Contractors,* 614 F.2d at 134.

#### IV.

Enforcement of the Board's orders is GRANTED.