NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LYON & RYAN FORD, INC.,
Respondent.

No. 80–1312.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1981.

Decided April 24, 1981.

Michael Messitte, Gen. Cnsl., NLRB, Washington, D. C., for petitioner.

James F. Hendricks, Jr., Oak Brook, Ill., for respondent.

Before WOOD and CUDAHY, Circuit Judges, and MAROVITZ, Senior District Judge.[*]

CUDAHY, Circuit Judge.

The National Labor Relations Board has petitioned this court pursuant to Section 10(e) of the National Labor Relations Act for enforcement of an order issued against respondent, Lyon & Ryan Ford, Inc., (the "Company") for violations of Sections 8(a)(5), 8(a)(3) and 8(a)(1) of the Act. See 29 U.S.C. § 160(e), § 158(a) (1979). In its order, the Board adopted the findings and recommendations of an Administrative Law Judge [1] and concluded that respondent had recognized Automobile Mechanics Local 701, International Association of Machinists and Aerospace Workers, AFL–CIO (the "Union") as the employees' bargaining representative. According to the Board, the Company later withdrew this recognition by demanding a "federal election" and refused to bargain with the Union in violation of Section 8(a)(5) of the Act. The Board further found that the employees' strike in

---

[*] The Honorable Abraham L. Marovitz, Senior District Judge for the Northern District of Illinois, is sitting by designation.

[1.] The Board's order is reported as *Lyon & Ryan Ford, Inc.*, 246 NLRB No. 2 (1979).

response to the Company's withdrawal of recognition was an unfair labor practice strike, and that the Company's action in discharging six employees because of their involvement in that strike violated Sections 8(a)(3) and 8(a)(1). Finally, the Board determined that a Company executive's conversations with two employees concerning their feelings about the Union constituted impermissible interrogation and also violated the provisions of Section 8(a)(1). The order which the Board seeks to enforce requires the Company to bargain with the Union on request, to reinstate the six discharged employees with backpay and to cease and desist from engaging in further violations of the National Labor Relations Act. For the reasons set forth below, we conclude that the Board's findings are supported by substantial evidence on the record as a whole, and therefore, we grant enforcement of the Board's order.

## I.

### THE FACTS

Lyon & Ryan Ford, Inc. is a new and used car dealership located in Antioch, Illinois, which employs workers in various capacities to prepare and service the cars it sells. On August 17, 1978, a representative of the Union met with certain Company employees to discuss the benefits of unionization. Several days later, at a second meeting, ten Company employees signed union authorization cards and applications for union membership.[2]

These cards were presented to Company President Larry Ryan by Union business representatives Donald Carlson and Ed Vaughn at an impromptu meeting on August 24, 1979. Carlson and Vaughn went to Ryan's office with a copy of a letter, allegedly in the mail, which advised the Company that a majority of its "mechanics, bodymen, painters, semi-skilled and apprentices" had designated the Union as their collective bargaining agent. The letter demanded formal recognition of the Union and commencement of negotiations for a collective bargaining agreement.

During the ensuing discussion with Ryan, Carlson clarified the composition of the proposed bargaining unit. Carlson stated that the Union traditionally represented only those employees "who turn wrenches, not anybody else." In the Ryan dealership, "the parts men, the chasers, the parts chasers, the car washers and the hikers" would be excluded, leaving approximately twelve to fourteen employees in the unit represented by the Union. Ryan personally examined each of the eleven signed union authorization cards and membership applications. He also inspected a copy of the recently expired master contract for the Chicago area and a voting information sheet which contained the changes to be included in the new, but then unpublished, master contract. Carlson briefly explained the general terms of the contract and answered Ryan's specific questions on the cost of welfare and pension provisions and the Union's insurance coverage. Before concluding the meeting, Carlson reviewed the proposed wage scale with Ryan and pointed out that the Union and the Company were not far apart on this issue. Carlson asked for another meeting and Ryan agreed.

The second meeting between representatives of the Union and the Company occurred four days later on August 28, 1978. Carlson, Vaughn, Larry Ryan and his son, Patrick, who served as general manager for the dealership, were in attendance. The discussion, once again, centered on the terms of the master contract. Larry Ryan stated that the Company's present vacation policy was better than the Union's contractual provision on the subject, but Carlson replied that he would take the good with the bad and go with a straight "701 Contract."

The focus of the meeting then shifted to the job classification of specific employees.

---

**2.** A total of eleven authorization cards were signed by Company employees. There was evidence presented, however, that employee Mark Mantsch, whose signed card was dated August 22, 1978, did not attend the Union meeting. As a result, the Administrative Law Judge decided not to count his card for the purpose of determining the Union's majority status.

All but two of the employees were classified as mechanics, semi-skilled or apprentices. The two exceptions were Gary Wilke, whom Larry Ryan categorized as a detailer, and Mark Mantsch, a wash boy, who had been doing mechanical work under the supervision of another employee. Carlson subsequently sorted through the authorization cards and placed the cards of five employees in a pile identified as journeymen. The cards of four other employees were placed in a separate pile labeled semi-skilled and apprentices. A third pile was created for the cards of Wilke and Mantsch. Carlson commented that there was a "problem" with respect to the manner in which these individuals would be classified within the unit or whether they would be included in the unit at all. The parties then discussed the balance required between mechanics, semi-skilled and apprentices, and Carlson gave examples of the situation at other dealers. Carlson requested a third meeting to resolve the Wilke-Mantsch classification question and was then given permission to go into the shop and talk to some of the employees.[3]

Later that day, Patrick Ryan approached employee Anthony Hynous at his work station and asked about the "circumstances with the Union." Hynous replied that the employees felt the Union could obtain better benefits for them. Ryan asked if more money would do, and Hynous indicated that the employees would have to evaluate that. Ryan left with the comment that "he guessed he had some talking to do."

Similarly, on August 29th, the younger Ryan called employee Michael Stern into his office and asked him what he thought about the Union. Stern answered that it sounded good, and that the Union was something the employees really wanted. Ryan then asked if money would make a difference, and Stern responded that he really didn't know.

When Carlson and Vaughn arrived for the third scheduled meeting with the Company on September 1, 1978, Larry Ryan called for a "federal election." Carlson responded that he was very disappointed with the decision since everything had been going along fine with the exception of two employees. He announced that the Union didn't have the time or the need for an election and if a contract was not signed by September 12th, "there would be a work stoppage." Carlson and Vaughn then informed two unit employees that the Company wanted an election and that the employees should be prepared to strike if a contract had not been signed by September 12th.

Eleven Company employees walked off the job on September 12, 1978, and began picketing the dealership. Six of those employees received a copy of the following form letter from the Company at various times during the month of October:

> This letter is to inform you that effective _____, we have hired an individual who will replace you on our work force. Accordingly, it will not be our intention to recall you to work at the conclusion of our labor dispute inasmuch as the new employee will be taking your place.

246 NLRB at 4.[4] The strike was still in effect on April 11, 1979, when an Adminis-

---

3. At the administrative hearing, Larry Ryan denied that he ever gave Carlson and Vaughn permission to talk to the employees on work time. But the ALJ credited the Union representatives' testimony over that of Ryan and explained:

    I was not impressed with the demeanor of Mr. Ryan or of his son Patrick Ryan who testified regarding the second and third visits Carlson and Vaughn made to Ryan's office. I found Carlson and Vaughn to be more open and cooperative on cross and their testimony appeared more logical under the circumstances. Also there were noticeable conflicts

between Larry and Patrick Ryan, the most notable involving the authorization and application cards.... Therefore, I have discredited the testimony of Larry and Patrick Ryan to the extent it conflicts with the testimony of Carlson and Vaughn.

246 NLRB at 34.

4. The dates of the letters and the effective dates of replacement are as follows:

    Ronald Blood—October 4, 1978—effective October 4, 1978

    Patrick J. Cullinan—October 30, 1978—effective October 30, 1978

trative Law Judge conducted a hearing in this case.

From these facts, the ALJ concluded that the Union represented a majority of the employees in an appropriate unit and had satisfactorily demonstrated that status to Company President Larry Ryan, who recognized the Union as bargaining representative for unit employees on August 24, 1978. The ALJ further found that the Company had engaged in discussions and negotiations with the Union over terms of the proposed contract on that date and on other occasions but subsequently violated Section 8(a)(5) of the National Labor Relations Act by withdrawing recognition and refusing to bargain. In addition, the ALJ found that the strike which began on September 12, 1978, resulted directly from the Company's withdrawal of recognition and was thus an unfair labor practice strike. By discriminatorily discharging six employees for their involvement in that strike, the Company violated Sections 8(a)(3) and 8(a)(1) of the Act. The ALJ also concluded that a separate 8(a)(1) violation occurred when a company executive interrogated two employees about their Union activity.[5]

On October 5, 1979, the Board issued an order adopting the findings and recommendations of the Administrative Law Judge. The order instructed Lyon & Ryan Ford, Inc., to bargain with the Union on request and to reinstate the six discharged employees with backpay from the date of their discharge letters, even if this required the release of replacement employees. The Company was also ordered to cease and desist from engaging in further violations and to post appropriate notices. The Board subsequently petitioned this Court for enforcement of the order.

## II.

■ The scope of judicial review accorded to an NLRB order upon petition for

Anthony Hynous—October 30, 1978—effective October 30, 1978
Michael Stern—October 30, 1978—effective October 30, 1978
Edward Wagner—October 3, 1978—effective September 18, 1978

enforcement is appropriately narrow. The National Labor Relations Act specifically directs that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall be conclusive." 29 U.S.C. § 160(e). Our inquiry is thus limited to determining whether the record in its entirety provides a proper basis for the Board's decision. Although all evidence which fairly detracts from the weight of the Board's decision must be considered, it is not our function to substitute our judgment for that of the Board when its judgment is supported by substantial evidence on the record as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Mars Sales & Equipment Co.*, 626 F.2d 567 (7th Cir. 1980); *Altemose Constr. Co. v. NLRB*, 514 F.2d 8 (3d Cir. 1975).

### A. The Section 8(a)(5) Violation

■ The National Labor Relations Act authorizes two methods for the establishment of a binding bargaining relationship between an employer and a labor union. 29 U.S.C. § 159(a). Generally, NLRB certification of a union's success in an election is the more prevalent practice, but it is not the only route by which a union may acquire the status of bargaining representative. *NLRB v. Newspapers, Inc.*, 515 F.2d 334 (5th Cir. 1975). An employer's voluntary recognition of a majority union remains "a favored element of national labor policy." *NLRB v. Broadmoor Lumber Co.*, 578 F.2d 238, 241 (9th Cir. 1978). An employer who has not committed unfair labor practices and has not recognized a union has the right to require an election regardless of the union's showing of majority status. But once the employer recognizes the union, no matter how informally, he loses the right to require an election. *NLRB v. Brown & Connolly, Inc.*, 593 F.2d 1373 (1st Cir. 1979);

Lawrence Weigman—October 3, 1978—effective October 2, 1978.

5. This Section 8(a)(1) violation is not contested on appeal.

*NLRB v. Gogin,* 575 F.2d 596 (7th Cir. 1978). The essence of voluntary recognition is the "commitment of the employer to bargain upon some demonstrable showing of majority [status].... Once that commitment [is] made, [the employer cannot] unilaterally withdraw its recognition and to do so [is] a violation of the Act." *Jeer-Dan Corp.,* 237 NLRB 302, 303 (1978), *enforced,* 601 F.2d 575 (3d Cir. 1979). *Accord, Brown & Connolly,* 593 F.2d at 1374; *NLRB v. A. Lasaponara & Sons, Inc.,* 541 F.2d 992 (2d Cir. 1976), *cert. denied,* 430 U.S. 914, 97 S.Ct. 1325, 51 L.Ed.2d 592 (1977); *Toltec Metals, Inc. v. NLRB,* 490 F.2d 1122 (3d Cir. 1974).

In the present case, the record substantially supports the Board's conclusion that the Company recognized the Union as majority representative of its mechanics, semiskilled, apprentices, bodymen and painters when Larry Ryan checked the employees' union authorization cards and membership applications on August 24, 1978.[6] At this initial meeting with Union representatives, Ryan also examined a copy of the proposed contract and discussed various contractual provisions. He voiced no objection to the Union as a properly designated bargaining representative, and negotiations continued at a second meeting several days later, in which the parties compared Union contractual provisions with current company policy and considered the job classification of employees within the proposed bargaining unit. After scheduling a third meeting to settle differences over the inclusion of two employees in the bargaining unit, Larry Ryan gave the Union representatives permission to speak to employees during working hours. This course of conduct is consistent with, and indicative of, the commitment necessary to create a bargaining relationship and warranted a finding by the Board that the Company had recognized the Union as the employees' bargaining agent.

The Company argues, however, that Ryan never recognized the Union, first, because the parties failed to agree on an appropriate bargaining unit, and second, because the Union did not represent a majority of the required employees.[7] It is undisputed that identification of an appropriate bargaining unit is a prerequisite to the determination of a union's majority status. *NLRB v. SAC Constr. Co.,* 603 F.2d 1155 (5th Cir. 1979). In the instant case, both the ALJ and the Board concluded that the parties were in agreement as to the definition of the unit. Neither party disputes the fact that the Union demanded recognition as the bargaining agent only for the dealer-

---

6. The Company questions the finding that Ryan examined the cards at the August 24th meeting by pointing to an alleged conflict in the testimony of the two Union representatives. According to the Company, "one [of the representatives] stated that the cards were offered to Mr. Ryan in response to his questions concerning the composition of the unit they claimed to represent, ... and the other implied that Mr. Ryan's question was more in the nature of a demand for proof of majority status." Respondent's Br. at 17. In view of the Company's statement that "Both Union representatives testified that Mr. Ryan looked at each card handed to him [at the first meeting]", we find no meaningful conflict in this testimony which would cast doubt upon the Board's finding that Ryan examined the cards on August 24th. *See* Respondent's Br. at 5.

7. The Company also attempts to justify its withdrawal of recognition on the basis of the Supreme Court's decision in *Linden Lumber Div., Summer & Co. v. NLRB,* 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974), which held that an employer had the right to refuse to recognize the union and to request an election on the basis of a proffered card majority. In *Linden,* however, the Court carefully noted that the employer and the union "had never voluntarily agreed upon any mutually acceptable and legally permissible means other than a Board conducted election for resolving the issue of union majority status." *Id.* at 310 n. 10, 95 S.Ct. at 434. Since the Court expressly reserved the question whether a union which possessed a card majority was required to submit to an election "if the employer breache[d] his agreement to permit majority status to be determined by means other than a Board election," the *Linden* decision is not controlling here. Once an employer has voluntarily recognized a union, he loses his right to require an election. *NLRB v. Brown & Connolly, Inc.,* 593 F.2d 1373 (1st Cir. 1979); *NLRB v. Gogin,* 575 F.2d 596 (7th Cir. 1978); *NLRB v. A. Lasaponara & Sons, Inc.,* 541 F.2d 992 (2d Cir. 1976); *Toltec Metals, Inc. v. NLRB,* 490 F.2d 1122 (3d Cir. 1974).

ship's "mechanics, bodymen, painters, semi-skilled and apprentices." In response to specific questions from Larry Ryan, Union representatives stated that they represented only "people who turn wrenches, not anybody else." The "parts people, the chasers, the parts chasers, the car washers and the hikers" were expressly excluded. Ryan made no objection to the scope of the unit at any time during these discussions.

The issue of job classification was discussed in greater detail at the second meeting between the parties. Union representatives explained that in a "new" shop, the employees classified themselves by describing the job they were hired to fill. Final classification, however, remained a subject of negotiation. When Ryan and Union representatives examined the job description on each employee's authorization card, agreement was reached on the classification of nine mechanics, semi-skilled and apprentices, but Ryan objected to the inclusion of Gary Wilke, a detailer, and Mark Mantsch, a wash boy, in the unit. The Company now contends that the Union's attempt to include these individuals in the bargaining unit "created confusion about the overall scope of the unit sought and made it apparent that, in the context of the realities of Respondent's employee situation, the Union's definition of the unit was ambiguous." Respondent's Br. at 24. Since a union request to bargain on behalf of an ambiguously defined unit may be fatally defective, the Company claims that Ryan never recognized the Union.

The Company's argument is unpersuasive. The fact that the parties failed to agree on the inclusion within the unit of two employees does not necessarily prove that the parties failed to agree substantially on the definition or scope of the unit. In *National Can Corp. v. NLRB*, 374 F.2d 796 (7th Cir. 1967), this court explained, "once having defined the unit it claims to represent and having made a bargaining demand on that basis, the Union has thereby established the frame of reference for measuring the validity of its demand." *Id.* at 801. Here, the Union clearly defined the unit it sought to represent as "mechanics, bodymen, painters, semi-skilled and apprentices" and made a bargaining demand on the basis of authorization cards from a majority of employees in those categories.

■ While it is true that the Board usually groups all employees in an automotive service department into a single bargaining unit, (*see, e. g., Graneto-Datsun*, 203 NLRB 550 (1973)), a smaller unit is acceptable if it has been agreed to by the parties and is not repugnant to the National Labor Relations Act. *Otis Hospital, Inc.*, 219 NLRB 164 (1975); *Harvey Russell*, 145 NLRB 1486 (1964). The Union in this case was a party to over three hundred similar agreements with Chicago area auto dealerships, and all but two of these agreements covered the same scope of bargaining unit as defined here. The existence of these comparable units tends to negate any claim that the failure to include all automotive service personnel in the particular bargaining unit in the instant case creates any fatal frailties in the definition of the unit.

■ Moreover, there was substantial evidence in this case to support the Board's conclusion that the parties agreed to the smaller bargaining unit. The Company not only failed to make any objection to the scope of the unit, but also negotiated with the Union over membership within that unit. The Board has long sought to encourage parties to agree voluntarily to the coverage of an appropriate bargaining unit. *NLRB v. Chelsea Clock Co.*, 411 F.2d 189 (1st Cir. 1969). The salutary purpose of such agreements would be frustrated if, once concluded, the parties were free to repudiate them at will. In the absence of extraordinary circumstances or a clear denial of employees' rights, neither of which are present in the instant case, we cannot sanction the subsequent repudiation of a Union's right to bargain on behalf of a smaller, yet otherwise appropriate, bargaining unit which has received the Company's implicit approval.

The Company also claims that the Board erred in concluding that Larry Ryan recognized the Union on August 24th because the

Union failed to properly demonstrate its majority status. According to the Company, Ryan never examined the employees' authorization cards at the initial meeting with Union representatives. This argument relies primarily on the testimony of witness Michael Stern, a former Lyon & Ryan employee. At the hearing before the ALJ, Stern testified that he attended a Union organizational meeting on the evening of *August 28th* (well after August 22nd) with ten or eleven of the dealership's employees, and all of the employees present then signed union authorization cards. Stern explained further that one of the employees whose signed card had been included in the evidence before the ALJ was not present at the card-signing meeting on *August 28th.* The ALJ credited that portion of Stern's testimony which related to the absent employee and refused to count the employee's card when determining the Union's majority status. Stern's testimony was discredited, however, insofar as it indicated that the cards were not signed on August 22nd, the date indicated on the cards. The Company suggests that the ALJ arbitrarily selected those portions of Stern's testimony which supported the ALJ's conclusion and ignored the rest.

This court accords great weight to the credibility determinations of an administrative law judge, which are based on the first hand observations of a witness' demeanor. *NLRB v. Blue Hills Cemetery, Inc.*, 567 F.2d 529 (1st Cir. 1977). In reviewing the ALJ's findings, however, this court should consider "the consistency and inherent probability of the testimony." *Universal Camera Corp.*, 340 U.S. at 496, 71 S.Ct. at 468. We conclude that the discredited portions of Stern's testimony are directly contrary to the testimony of other witnesses and inherently improbable. The ALJ based his finding that the authorization cards were signed prior to the August 24th meeting on three factors: 1) the testimony of Union representatives Donald Carlson and Ed Vaughn; 2) the testimony of Company employee Anthony Hynous, which corroborated the Union representatives' testimony as to the dates of the or-

ganizational meetings; and 3) the dates entered on the cards themselves. It is not this court's function to second guess the ALJ or to retry the case on appeal when substantial evidence supports the administrative determination. After reviewing the record, we conclude that the factors outlined by the ALJ satisfy the substantial evidence test and adequately resolve any doubts raised by contrary testimony or inferences.

The course of conduct pursued by the Company following the Union's demand for recognition on August 24th supports the Board's finding that a bargaining relationship had been established. After voluntarily recognizing the Union, the Company was obligated to bargain for a reasonable period so that the relationship could be given a fair chance to succeed. *Franks Bros. v. NLRB*, 321 U.S. 702, 706, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1944). We believe that three meetings in seven days does not exhaust the requirement for bargaining over a reasonable period. Hence, we accept the Board's finding that the Company's request for a federal election on September 1, 1978, constituted a withdrawal of recognition and a refusal to bargain in violation of Section 8(a)(5) and enforce that portion of the Board's order.

## B. The Section 8(a)(3) Violation

After the Company's unlawful withdrawal of recognition and refusal to bargain on September 1st, Union representatives informed Ryan that the employees would strike if they did not have a signed contract by September 12th. When no contract was forthcoming, eleven Company employees struck and picketed the dealership. Less than a month later, several of the strikers received letters from the Company stating that a replacement employee had been hired and that the Company had "no intention" of recalling the striking employee to work at the end of the labor dispute.

After examining the ALJ's report, the Board concluded that the strike was "caused and prolonged" by the Company's withdrawal of recognition and refusal to

bargain. A strike which is caused in whole or in part by an employer's unfair labor practice is an unfair labor practice strike. *NLRB v. My Store, Inc.*, 345 F.2d 494 (7th Cir.), *cert. denied*, 382 U.S. 927, 86 S.Ct. 315, 15 L.Ed.2d 340 (1965); *NLRB v. Waukesha Lime & Stone Co.*, 343 F.2d 504 (7th Cir. 1965). Unlike employees who strike for economic reasons, unfair labor practice strikers "do not lose their [employee] status and are entitled to reinstatement with backpay, even if replacements for them have been made." *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956). The Board therefore concluded that the letters which stated that the Company had no intention of recalling the strikers constituted notices of discharge and violated Section 8(a)(3) and (1) of the Act.

In these enforcement proceedings the Company contends that the Board erred by ignoring evidence of the Union's express purpose in calling the strike. Relying on the testimony of a Union representative which indicated that the employees' picket signs read, "On Strike for Recognition," the Company argues that the Board failed to accord proper weight to the Union's own characterization of the strike. The Company contends that in *Drug Package, Inc. v. NLRB*, 570 F.2d 1340 (8th Cir. 1978), *on remand*, 241 NLRB No. 44 (1979), *petition den. sub nom. Willenbrink v. NLRB*, 612 F.2d 1088 (8th Cir. 1980), the court considered both the availability and use of picket signs bearing slogans indicating that union recognition had not taken place and rejected the Board's determination that a strike should be characterized as arising out of an unfair labor practice.

■ We are, however, unpersuaded by the Company's argument. A strike may be an unfair labor practice strike even though it contains some recognitional objectives. *Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814, 820 (6th Cir. 1975); *NLRB v. Juniata Packing Co.*, 464 F.2d 153, 155 (3d Cir. 1972). Contrary to the Company's assertion, the *Drug Package* court did not reject the finding of an unfair labor practice strike because of the Union's picket sign slogans. Instead, the court, having reversed the Board's 8(a)(5) finding, concluded that, "without that crucial element [an 8(a)(5) violation], the strike cannot be deemed an unfair labor practice strike." *Drug Package*, 570 F.2d at 1348. In the instant case, on the other hand, we have accepted the Board's determination of a Section 8(a)(5) violation. After a thorough review of the record, we also conclude that substantial evidence supports the Board's finding that the strike, although perhaps seeking some recognitional objectives, was primarily caused by the Company's unlawful withdrawal of recognition and refusal to bargain.

Finally, the Company objects to the Board's conclusion that the dealership permanently discharged and refused to reinstate six striking employees in violation of Section 8(a)(3) and (1). The Company claims that the Board failed to articulate any basis for this finding. It is the Company's position that the letter sent to the employees represented notice of replacement to economic strikers rather than notice of discharge to unfair labor practice strikers.

■ Having concluded that the employees were participating in a bona fide unfair labor practice strike, we need only determine whether substantial evidence supports the Board's conclusion that the letters constituted notice of discharge. The pertinent portions of the letter stated, "we have hired an individual who will replace you on our work force. Accordingly, it will not be our intention to recall you to work at the conclusion of our labor dispute inasmuch as the new employee will be taking your place." While the letter carefully avoids using the words, "discharged," "fired," or "terminated," we think the Company's purpose is clear. By indicating that the employee would not be recalled, the Company emphasized that a request for reinstatement would be futile. Under the facts of the instant case, there is no meaningful distinction between discharging an employee and permanently replacing him. Thus, the record fully supports the Board's determination that the Company discharged six un-

fair labor practice strikers in violation of Section 8(a)(3) and (1).

## III.

■ Section 10(c) of the National Labor Relations Act directs the Board to develop remedies which will carry out the policies of the Act. *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953). Since the relation of remedy to policy in the field of unfair labor practices is a matter within the Board's particular experience and administrative competence, the courts accord wide discretion to the Board in this area. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). "Unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act," the Board's determination will be affirmed. *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).

In the present case, the Board, relying on its decision in *Abilities & Goodwill, Inc.*, 241 NLRB No. 5 (1979), ordered the Company to reinstate the six unlawfully discharged employees with backpay from the date of discharge. The Company responds that this remedy, the imposition of which overrules more than thirty years of Board precedent with respect to strikers, improperly places an unreasonable burden on the employer and should be set aside. Because we think the Board could reasonably conclude that its former policy, which had the effect of sanctioning disparate treatment as between discriminatorily discharged working employees and discriminatorily discharged striking employees, is inequitable and inadequate, we affirm the Board's backpay order.

The discretion accorded the Board in devising appropriate remedies for labor viola-

tions has been most evident with respect to backpay awards. Rather than relying on rigid formulas, the Board has tried to use a more flexible approach "to attain just results in diverse, complicated situations." *Phelps*, 313 U.S. at 198, 61 S.Ct. at 854. In each case, the "just result" represents "a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination." *Id.* at 194, 61 S.Ct. at 852.

In the case of an unlawfully discharged, working employee, a "just result" requires reinstatement and backpay from the date of discharge. No request for reinstatement was necessary because the Board reasoned that such a plea would fall on deaf ears. Generally, an employer would not voluntarily grant a request to rehire an individual whom he had just fired. In addition, the Board believed that the employer, who unlawfully discharged the employee in the first place, bore the onus of undoing the damage by offering the employee immediate reinstatement and reimbursement for all losses suffered from the date of the discriminatory action.

A different rule controlled, however, when the Board considered the case of an unlawfully discharged striking employee. In the absence of an unconditional offer by the employee to return to work, a "just result" included reinstatement but no backpay. For many years, this rule was applied as "established Board precedent" although it enjoyed less than unanimous Board approval.[8]

In *Abilities & Goodwill*, the Board (with members Pennello and Murphy dissenting) announced a change in the policy governing backpay awards. The Board declared "a discharged striker is a discharged employee and entitled to be treated as such, for there is nothing peculiar to a strike which justifies dissimilar treatment. The nature of

---

**8.** *See, e. g., Bartlett-Collins Co.*, 230 NLRB 144 (1977); *Michael Muldoon Elder, d/b/a Vorpal Galleries*, 227 NLRB 446 (1976); *Valley Oil Co., Inc.*, 210 NLRB 370 (1974); *Roosevelt Roofing and Sheet Metal Works, Inc.*, 204 NLRB 671 (1973); *Astro Electronics, Inc.*, 188 NLRB 572 (1971); *Universal Services, Inc.*, 184 NLRB 381 (1970); *Sea-Way Distributing, Inc.*, 143 NLRB 460 (1963); *Elm Tree Baking Co.*, 139 NLRB 4 (1962); *Sea View Industries, Inc.*, 127 NLRB 1402 (1960); *Wheatland Electric Cooperative, Inc.*, 102 NLRB 1119 (1953); *National Gas Co.*, 99 NLRB 273 (1952); *Happ Brothers, Inc.*, 90 NLRB 1513 (1950); *Kallaher and Mee, Inc.*, 87 NLRB 410 (1949); *Massey Gin and Machine Works, Inc.*, 78 NLRB 189 (1948).

the employer's unlawful conduct is not changed by the fact that the employee happens to be a striker at the time of discharge." *Goodwill* at 3. As a result, the Board concluded that an unlawfully discharged striker is no longer required to request reinstatement to trigger an employer's backpay obligation.

██ The Company argues, however, that the *Abilities & Goodwill* remedy is inappropriate because the employer who discharges a striking employee cannot aptly be termed a "wrongdoer." After all, the Company contends, the employees would not have been "permanently replaced" if they had not engaged in the strike. This argument highlights the ambiguity inherent in the discharge of a striker. As this court recently explained:

> On the one hand, the employee may voluntarily be refraining from work, as evidenced by the fact that he was initially on strike. [I]n this case, a back pay award would more than make him whole for his unlawful discharge and thus would not be consistent with the remedial purposes of the Act. *See Republic Steel Corp. v. NLRB*, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 ... (1940). On the other hand, the employee may not have returned to work because of the unlawful discharge, thinking it futile to even ask to be reinstated.

*NLRB v. Mars Sales & Equipment Co.*, 626 F.2d 567, 574 (7th Cir. 1980). Rather than requiring the discharged employee to engage in the presumably futile act of requesting reinstatement, we believe that the ambiguity may be resolved against the employer who committed the unfair labor practice. The employer is thus liable for backpay unless he can affirmatively establish that the unlawful discharge did not prevent the employee from returning to work.[9]

This result is not as onerous as it may appear. As in the case of any discharged employee, the employer must make an offer of reinstatement. If the striking employee thereafter refuses to return to work, the employer's position is vindicated and his backpay obligation is tolled. When the employee willfully withholds his services, the employer is thus not responsible for his corresponding loss of earnings. Even where an employer fails to offer reinstatement, he is entitled to reduce his backpay liability by presenting evidence that the employee would have refused the reinstatement offer had it been made.

██ Moreover, the policy we enforce here is not so much an abrupt departure from Board precedent as it is the natural evolution of the Board's efforts over the years to achieve a "just result." Several years prior to *Abilities & Goodwill*, the Board created a futility exception to the reinstatement rule for discharged strikers. Under this exception, if evidence indicated that a request for reinstatement would be futile, the striker was entitled to reinstatement with backpay even if no request had been made. *See, e. g., Sigma Service Corp.*, 230 NLRB 316 (1977); *Valley Oil Co., Inc.*, 210 NLRB 370 (1974). It was neither unreasonable nor unforeseeable that the Board should elect to extend this exception by creating a presumption of apparent finality of discharge in strike situations. It would appear to be a rare case where a reinstatement request by a striking employee who had just been fired would *not* be futile. Since the backpay award for unlawfully discharged working employees is based on an identical presumption of futility, the reasons for distinguishing logically between the two situations tend to disappear. Particularly in the instant case, where the employer unlawfully discharged

9. We implicitly accepted this remedy in *NLRB v. Mars Sales & Equipment Co.*, 626 F.2d 567 (7th Cir. 1980). In that case, the Board found that the Company violated Sections 8(a)(1) and (3) by discharging two employees, Metzger and Neaville, who were participating in an economic strike. Since permanent replacements had not been hired for these individuals at the time they were discharged, the Board ordered the Company to offer reinstatement to both employees with backpay from the date of their unlawful discharge. We enforced the Board's order as to employee Neaville because it was "consistent with the remedial policies of the Act." *Id.* at 574. We declined to enforce the Board's order as to employee Metzger, however, because Metzger had resigned from the Company during the strike.

employees for participating in a strike caused by the employer's unlawful withdrawal of recognition and refusal to bargain, we see no reason to deny these employees reinstatement with backpay from the date of discharge. We emphasize, however, that essentially our conclusion only supports the Board's exercise of discretion and that some other result, if arrived at by the Board pursuant to the Act, might also in the appropriate circumstances be quite defensible.

Finally, the Company argues that the Board's retroactive application of the remedy announced in *Abilities & Goodwill* was improper because the strikers were discharged *before* the new backpay policy had been announced. We decline to adopt an unnecessary limitation on a policy which not only rectifies an apparent disparity in the treatment of discharged employees but which was also not an unforeshadowed departure by the Board from its prior line of decisions.

 Generally, a decision which changes existing law or policy is given retroactive effect unless retroactive application would cause "manifest injustice." *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). The Supreme Court has devised a three part test to identify situations in which a civil, nonconstitutional precedent should be applied on a prospective basis only:

1) Does the decision "establish a new principle of law, either by overruling clear past precedent on which the litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed?"

2) Considering "the prior history of the rule in question, its purpose and effect," does retroactive application "further or retard" the operation of the rule?

3) Does retroactive application create "injustice or hardship" for one of the parties?

*Chevron Oil Co. v. Huson*, 404 U.S. 106–07, 92 S.Ct. at 355 (1971). Since there is a presumption favoring retroactivity, all

three *Chevron* factors must support prospective application in order to limit the retroactive effect of the decision. *Valencia v. Anderson Bros. Ford*, 617 F.2d 1278, 1289 (7th Cir.), *cert. granted,* —— U.S. ——, 101 S.Ct. 395, 66 L.Ed.2d 242 (1980); *Schaefer v. First Nat'l Bank*, 509 F.2d 1287, 1294 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976).

In the instant case, the matter seems settled for us because the new rule was not an unforeshadowed departure from the Board's previously existing practice, and the Board has sufficiently demonstrated a basis for its view that retroactive application will further rather than retard the operation of the rule. In addition, retroactive application will not create substantial injustice or undue hardship for either party. The Board finds no valid reason for distinguishing between the status of an unlawfully discharged striker and of an unlawfully discharged working employee. Contrary to the Company's claim, the rule enforced here does not provide a windfall to striking employees but merely places the burden of undoing the wrong on the wrongdoer, where it seems properly to belong.

For the foregoing reasons, we grant enforcement of the Board's order.