# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-3054

INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL 150, AFL-CIO,

*Petitioner*,

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

and

TERRACON, INCORPORATED,

*Intervenor-Respondent.*

_____

Petition for Review of an Order of the
National Labor Relations Board.
Nos. 13-CA-39279, 13-CA-39271, 13-CA-39181

_____

ARGUED FEBRUARY 13, 2004—DECIDED MARCH 16, 2004

_____

Before FLAUM, *Chief Judge*, and MANION and DIANE P.
WOOD, *Circuit Judges*.

FLAUM, *Chief Judge*. As a result of two meetings with the
management of Terracon, Incorporated ("Terracon"), the
International Union of Operating Engineers, Local 150,

AFL-CIO ("the Union") concluded that it had been voluntarily recognized as the bargaining representative for Terracon's drillers and drill helpers. However, the National Labor Relations Board ("NLRB") disagreed and held that Terracon never voluntarily recognized the Union. The NLRB therefore dismissed the Union's claims that Terracon violated Section 8 of the National Labor Relations Act ("NLRA") by withdrawing voluntary recognition and refusing to bargain with the Union. The Union now petitions for review of the NLRB's order. Deferring to the considered judgment of the NLRB, we affirm.

## I. BACKGROUND

Terracon is a national engineering consulting firm which engages in soil testing. Its Naperville, Illinois facility employs nine drillers and drill helpers who run drill rigs to take soil samples. In January 2001, the drillers and drill helpers began unionization efforts by meeting with organizers from the Union and collecting union authorization cards. On February 19, 2001, seven drillers and drill helpers arrived at work wearing hats and buttons displaying the Union's insignia. The employees were accompanied by Stanley Simrayh, a union organizer, and Ken Edwards, a union attorney.

Upon arriving at Terracon, Simrayh and Edwards approached Terracon's office manager, Maroun Moussallem.[1] Simrayh introduced himself and Edwards as union organizers, and stated that they were there to seek voluntary recognition of the Union. Moussallem informed Simrayh and Edwards that he did not want to discuss this issue

---

[1] Terracon's brief adopts many spellings of "Moussallem." We will employ the first spelling used in Terracon's brief throughout our opinion.

in front of the employees, and asked if they would come into his office. Simrayh and Edwards agreed, and the three men walked into Moussallem's office.

Once in Moussallem's office, Simrayh stated that the Union represented a majority of the drillers and drill helpers, and gave Moussallem copies of signed authorization cards from all of the drillers and drill helpers. Moussallem reviewed the cards and set them on his desk. Simrayh commented that he had authorization cards from all of the drillers and helpers, and Moussallem agreed that this was true. At this point, Simrayh gave Moussallem a letter addressed to Keven Jefferis (Terracon's regional manager) demanding recognition and a Voluntary Recognition Agreement. However, Moussallem did not sign the Voluntary Recognition Agreement.

Simrayh then asked Moussallem if he could talk about the employees' wages, hours, and conditions of employment. Moussallem did not object, and Simrayh informed him that the employees wanted better winter clothing and shoes. Moussallem replied that neither of these issues was a problem. Simrayh then told Moussallem that the employees had safety concerns and wanted more time to inspect equipment and more HazMat training. Moussallem responded that this was "a good idea" and "a good way to go." Moussallem then asked if the Union represented any professional engineers. Simrayh informed him that the Union had competitive contracts at two other companies. Moussallem replied "we'll see about that." Simrayh asked if another meeting could be arranged, and Moussallem said the men should return later in the morning to speak with Keven Jefferis, Terracon's regional manager.

Later that day, Simrayh and Edwards returned to Terracon and asked to speak with Keven Jefferis. Jefferis allowed the men into his office, and they stated that they were there to seek voluntary recognition for the drillers and

drill helpers. They then gave Jefferis the same union authorization cards, letter of recognition, and Voluntary Recognition Agreement that they had shown Moussallem earlier that day. Jefferis reviewed the authorization cards, and when asked if they were signed authorization cards for all of the drillers and drill helpers, Jefferis agreed that they were. However, Jefferis did not sign the Voluntary Recognition Agreement.

Simrayh subsequently informed Jefferis that the men were interested in better winter clothing, more time to inspect the equipment, and additional HazMat training. Jefferis responded that these issues were just "peanuts." Jefferis then proceeded to ask the Union's organizers a series of questions about what the Union could do for Terracon. First, Jefferis asked what kind of training the Union provided for its members. Simrayh stated that the Union had an apprenticeship program for drillers. Next, Jefferis asked what kind of money the Union sought for the employees. Simrayh responded that the Union would be happy to negotiate a fair wage, and Jefferis informed him that Terracon would not be able to pay union wages and would subcontract the drilling work if they were forced to pay union wages. Finally, Jefferis asked about the Union's insurance program and requested a copy of its benefit plan.

The meeting between Jefferis and the Union's organizers lasted approximately an hour. At the conclusion of the meeting, Simrayh inquired whether the parties would meet again, and Jefferis stated that he would get back to them. As soon as Simrayh and Edwards left, Jefferis called Terracon's CEO, who advised that Jefferis hire a labor attorney. The next day, Simrayh sent Jefferis a letter stating that he believed the parties had begun bargaining and that Terracon had agreed to provide its employees with better winter clothing and HazMat training. In response, Terracon's new attorney drafted a letter stating that the Union's visit was a "courtesy call" and that no negotiations or bargaining had begun.

On February 21, 2001, Terracon filed a petition with the NLRB requesting an employee election regarding unionization. The Union subsequently filed an unfair labor practice charge against Terracon, alleging that Terracon had violated Section 8 of the National Labor Relations Act ("NLRA") by unlawfully withdrawing recognition from the Union. When Terracon later unilaterally changed the starting times for its employees, the Union filed another charge against Terracon for failing to bargain with the Union. Although the Administrative Law Judge found in favor of the Union, the NLRB reversed and found that Terracon had not voluntarily recognized the Union and therefore did not violate the NLRA by withdrawing recognition from the Union or refusing to bargain with the Union.

## II. DISCUSSION

A union becomes the exclusive bargaining representative for a group of employees either by prevailing in a secret ballot election conducted by the NLRB or by convincing the employer to voluntarily recognize it as the employees' representative. *See Lincoln Park Zoological Soc'y v. NLRB*, 116 F.3d 216, 219 (7th Cir. 1997). Voluntary recognition can be either explicit or implicit. Explicit voluntary recognition occurs when an employer expressly assents to a union's representation. *See Jefferson Smurfit Corp.*, 331 N.L.R.B. 809, 809 (2000). Implicit voluntary recognition occurs when an employer's statements or conduct clearly and unequivocally demonstrate that it has made a commitment to enter into negotiations with a union. *See Nantucket Fish Co.*, 309 N.L.R.B. 794, 795 (1992). In this case, the Union argues that the NLRB erred in concluding that Terracon did not voluntarily recognize the Union, and asserts that the Union was implicitly recognized as the employees' bargaining representative on February 19, 2001.

The scope of judicial review accorded to an NLRB order is appropriately narrow. *See NLRB v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 750 (7th Cir. 1981). We will uphold the NLRB's decision as long as its factual findings are supported by substantial evidence and its conclusions have a reasonable basis in the law. *See Dilling Mech. Contractors, Inc. v. NLRB*, 107 F.3d 521, 523-24 (7th Cir. 1997). Moreover, we will not displace the NLRB's choice between two fairly conflicting views, even if we "would justifiably have made a different choice had the matter been before [us] de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

Whether an employer voluntarily recognized a union is a question of fact, and is therefore reviewed for substantial evidence on the record as a whole. *See NLRB v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 750 (7th Cir. 1981). The Union argues that the NLRB's decision is not supported by substantial evidence because the evidence in this case showed that: (1) when Terracon reviewed the Union authorization cards, it stated "you got them all"; (2) Terracon engaged in actual bargaining with the Union; and (3) Terracon made a commitment to enter into future negotiations with the Union. We will address each of these arguments in turn.

### 1. Union Authorization Cards

The Union first asserts that an employer implicitly recognizes a union when it conducts a check of the union authorization cards and states "you got them all." In support of its argument, the Union cites *Jerr-Dan Corp.*, 237 N.L.R.B. 302 (1978) and *Brown & Connolly, Inc.*, 237 N.L.R.B. 271 (1978). However, neither of these cases hold that simply reviewing union authorization cards and then stating that the Union has collected them from all of the potential bargaining unit employees qualifies as implicit recognition.

Rather, in *Jerr-Dan Corp.*, 237 N.L.R.B. 302, 302 (1978), the employer reviewed the union authorization cards, agreed that all of the relevant cards were present, and then "agreed to meet again 4 days later . . . for the express purpose of engaging in collective-bargaining negotiations." In holding that the Union had been implicitly recognized, the NLRB based its finding on the employer's "commitment to enter negotiations with the Union, which is an implicit recognition of the Union's majority." *Id.* at 303. The NLRB never mentioned that agreeing the authorization cards were signed could also qualify as implicit recognition of a union.

Similarly, in *Brown & Connolly, Inc.*, 237 N.L.R.B. 271, 274-75 (1978) the employer not only acknowledged that a majority of its employees supported the Union, but also "stated that [it] recognized the union" and "agreed to a date for a further meeting at which negotiations would begin." Emphasizing that "[t]he arrangement of the meeting to begin negotiations leaves no doubt that [the employer], as well as the Union, understood that [it] had accepted the representative status of the Union and was prepared to engage in collective-bargaining negotiations with it," the NLRB held that the Union had been implicitly recognized. *Id.* at 275. Absent from the NLRB's discussion was any reliance on the fact that the employer had also stated that its employees appeared to be in favor of the Union.

In contrast, the NLRB has consistently held that merely reviewing authorization cards does not count as implicit recognition. *See Jefferson Smurfit Corp.*, 331 N.L.R.B. 809, 809 (2000). Employers have the "right to a Board election to resolve the issue of majority status," and they waive that right only if they enter into "a clear agreement" to do so. *Id.* at 809. The Union has presented no evidence that Terracon's statement "you got them all" constituted a clear agreement to waive the right to an election. Therefore, the Union's arguments on this point must fail.

*2. Bargaining*

The Union also contends that Terracon implicitly recognized the Union when the parties engaged in bargaining on February 19, 2001. Bargaining with a union is, of course, one of the ways an employer can implicitly recognize a union. *See Lyon & Ryan Ford*, 246 N.L.R.B. 1, 4 (1979). However, the NLRB concluded that no bargaining took place in this case because the discussions between the Union and Terracon did not have the give-and-take characteristic of negotiation. The Union disagrees, and cites Terracon's questions regarding union benefits and the discussion with Terracon about insurance costs as evidence of negotiation.

In concluding that Terracon's questions and the insurance discussion did not amount to bargaining, the NLRB relied upon *Ednor Home Care*, 276 N.L.R.B. 392 (1985). In *Ednor Home Care*, the employer met with a union representative for approximately forty-five minutes, during which time he reviewed the Union's authorization cards, "asked a number of questions regarding the probable nature and extent of the union demands and requested that [the Union] furnish a blank form of the union contract." *Id.* at 393. At one point, the employer even asked if the Union would accept fewer paid holidays than it had asked for, and the Union replied that the subject could be negotiated. Although the employer and Union discussed medical plans, pension plans, paid holidays, and vacation time, the NLRB held that no voluntary recognition had taken place because the parties merely "touched on" these issues and did not engage in "serious give-and-take negotiation." *Id.* Rather, the employer was speaking to the Union "in order to obtain as much information as possible" so that it could determine what its employees were "looking for (and willing to accept) as compared with their expectations of what the Union could obtain for them through collective bargaining." *Id.* at 394.

Just as in *Ednor Home Care*, Terracon merely touched upon issues of import in its discussions with the Union. Terracon's responses to the Union's proposals did not include serious give-and-take; instead, Terracon said these issues were "peanuts," "not a problem," and "a good way to go." Significantly, there were no compromises made and the parties' positions did not change. Moreover, Terracon's questions about what the Union would do for Terracon can reasonably be interpreted as Terracon's attempt to educate itself about the Union and the employees' interests. None of this amounts to clear and unequivocal evidence that Terracon was recognizing the Union as its employees' bargaining representative. *See Nantucket Fish*, 309 N.L.R.B. 794, 795 (1992).

This is in contrast to the clear and unequivocal evidence of voluntary recognition in *Lyon & Ryan Ford*, 246 N.L.R.B. 1 (1979). In *Lyon & Ryan Ford*, after looking through the union authorization cards, the employer and Union discussed details in the Union's proposed contract and the employer added up figures on his adding machine to determine how far apart the parties were on expected wages and benefits. *See id.* at 2. Four days later, the employer again met with the Union and the parties again discussed the proposed contract and began classifying each employee within the bargaining unit. By the end of the meeting, the parties had created two classifications of employees and had agreed to the categorization of all but two remaining employees. After the meeting concluded, the employer allowed the union representative go into the shop and talk to the employees. *See id.*

Despite the Union's arguments to the contrary, *Lyon & Ryan Ford* is clearly distinguishable from this case. In this case, there was no proposed contract discussed by the parties and the parties did not work together to determine how to categorize specific employees. The absence of

any compromise or teamwork is significant, and thus the Union's reliance on *Lyon & Ryan Ford* is misplaced.

We therefore conclude that the NLRB's determination that no bargaining took place was supported by substantial evidence. Furthermore, we note that the NLRB's decision is consistent with national labor policy, which favors the voluntary recognition of a majority union. *See NLRB v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 750 (7th Cir. 1981). Were the NLRB to adopt a definition of "bargaining" that included simple discussions or informational queries between unions and employers, employers might refrain from meeting with union representatives at all for fear of saying too much and inadvertently recognizing the union. This would inevitably lead to a decline in unionization, subverting the objectives of the NLRA.

### 3. Commitment to Bargain

Finally, the Union argues that even if Terracon did not bargain on February 19, 2001, it did make a commitment to bargain with the Union. According to the Union, Terracon committed itself to negotiate with the Union when: (1) Moussallem told the Union that they should return to speak with Jefferis; and (2) Jefferis told the Union at the end of their meeting that he would be in touch with them.

We conclude that neither of these statements establish Terracon's clear and unequivocal agreement to bargain with the Union. When statements are "susceptible to different, reasonable, but irreconcilable interpretations," the employer has not clearly and unequivocally agreed to bargain with a union. *See Nantucket Fish*, 309 N.L.R.B. at 795. An analysis of the statements at issue in this case reveals that both are ambiguous at best.

First, Moussallem's statement that the Union should come back "when Mr. Jefferis would be available" is easily

susceptible to differing interpretations. Although the Union argues that the statement should be interpreted as an invitation to return so that Jefferis could negotiate with the Union, an equally reasonable interpretation is that after being given a letter addressed to Jefferis demanding recognition for the Union, Moussallem believed that it was Jefferis who needed to decide the issue. The Union's behavior after meeting with Moussallem lends even more strength to the latter explanation, as the Union proceeded again to demand recognition and tendered the authorization cards and Voluntary Recognition Agreement upon first meeting Jefferis. These actions would not have been necessary had the Union already been recognized by Moussallem.

Second, Jefferis' statement that he "would be in touch" did not clearly show intent to enter into negotiations with the Union. An equally logical account of Jefferis' statement was that he would consider the Union's request for recognition and inform them later of his decision. *See Ednor Home Care*, 276 N.L.R.B. at 393 (holding that employer's statement that the Union should "get back to him" was too ambiguous to support a finding of commitment to enter into negotiations with the Union).

Because Terracon's statements to the Union are subject to more than one interpretation, they do not constitute "an unequivocal agreement to recognize and bargain with the Union." *See Nantucket Fish*, 309 N.L.R.B. at 795. The NLRB's finding that Terracon did not recognize the Union is therefore reasonable and supported by substantial evidence.

### III. CONCLUSION

The NLRB's finding that Terracon never granted voluntary recognition to the Union is supported by substantial evidence. Thus, Terracon did not violate the NLRA by

withdrawing recognition from the Union or by failing to bargain with the Union. For the foregoing reasons, we AFFIRM the NLRB's order.

A true Copy:

     Teste:

                           _____

                           *Clerk of the United States Court of Appeals for the Seventh Circuit*